UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ELIZABETH D'AIELLO,

Plaintiff,

- against –

FREEPORT HIGH SCHOOLS, THE FREEPORT SCHOOL
DISTRICT, DR. AARON JOHNSON, MS. GISSELLE
CAMPBELL-HAM, DR. KISHORE KUNCHAM & MR.
BENJAMIN ROBERTS,

Defendants,

Case No. 23-CV-00577-JMA

**FIRST AMENDED
COMPLAINT WITH
JURY DEMAND**

Hon. Judge Joan M. Azrack

Plaintiff, ELIZABETH D'AIELLO ("D'Aiello" or "Plaintiff"), through her attorney, Vincent Miletti, Esq., with the Law Office of Vincent Miletti, Esq., respectfully files this First Amended Complaint, pursuant to an Order dated September 6, 2023 (ECF # 15) against defendants, FREEPORT HIGH SCHOOLS ("Freeport"), THE FREEPORT SCHOOL DISTRICT ("District"), DR. AARON JOHNSON ("Johnson"), MS. GISSELLE CAMPBELL-HAM ("Campbell-Ham") DR. KISHORE KUNCHAM ("Kuncham") and MR. BENJAMIN ROBERTS ("Roberts") (collectively, "Defendants") as follows:

## NATURE OF THE ACTION

1.      This is an action arising under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act ("ADA"), the New York State Human Rights Law, N.Y. Exec. Law §290, et seq. ("NYSHRL"), and state common law seeking declaratory and injunctive relief and damages to redress the harms and losses that Plaintiff suffered because of unlawful workplace practices perpetrated and ratified by defendants, predicated on their unlawful discriminatory conduct, which discriminated against Plaintiff based on race and disability, which was only exacerbated once they engaged in invidious retaliation for her opposition to the

defendants' unlawful, discriminatory conduct. Furthermore, in addition to the claims based on discrimination, harassment and retaliation, the Plaintiff brings this action seeking damages for the negligent infliction of emotional distress and civil assault, battery and apprehension in violation of state law.

2.        Plaintiff has been a dedicated School Psychologist for Freeport High School ("Freeport") since February 2004 and has devoted her life to helping shape and build the minds of today's youth within the State's educational system. Despite her best efforts, however, Plaintiff, a Caucasian female of Italian descent, could not overcome the blatant prejudices and biases that permeated her work environment. Indeed, although she had more than proved her worth as a School Psychologist, schoolteacher, mentor and friend to her students, Plaintiff was labeled as nothing more than a "Karen," subjected to a hostile, discriminatory and toxic work environment, where she was placed under apprehension, excluded from meetings and events, denied basic terms and conditions as an employee, denied time off, denied corrective measures, and simply subjected to blatant disparate treatment and a toxic work environment on the basis of her race.

## PARTIES

3.        Plaintiff, ELIZABETH D'AIELLO, is an individual residing in Kings County, New York. Plaintiff was employed by Defendant FREEPORT PUBLIC SCHOOLS working directly under Defendants, DR. AARON JOHNSON ("Johnson") & MS. GISSELLE CAMPBELL-HAM ("Campbell-Ham"), DR. KISHORE KUNCHAM ("Kuncham"), and MR. BENJAMIN ROBERTS ("Roberts"), and/or certain other supervisors. At all times relevant herein, Plaintiff was an "employee" within the meaning of the NYSHRL.

4.        Defendant FREEPORT HIGH SCHOOLS is a municipal corporation with substantial operations in the State of New York doing business at 235 North Ocean Avenue, Freeport, New York 11520.

5.      Defendant FREEPORT SCHOOL DISTRICT is a municipal corporation with substantial operations in the State of New York doing business at 235 North Ocean Avenue, Freeport, New York 11520.

6.      Upon information and belief, defendant, DR. AARON JOHNSON, is an individual residing in the State of New York. He is sued in his individual capacity and official capacity as an Assistant Principal of the Freeport Public School System.  Dr. Johnson may be held individually liable for discrimination in violation of the NYSHRL, NY Exec Law § 290 et seq., as either an employer under Executive Law § 296(1), or as an aider and abettor under § 296(6).

7.      Upon information and belief, MS. TONDRA JACKSON, while not a named party in this action, is a referenced defendant herein, and is an individual residing in the State of New York. Ms. Jackson serves as a secretary for Mr. Johnson, working with the Freeport Public School System.

8.      Upon information and belief, defendant MS. GISSELLE CAMPBELL-HAM, is an individual residing in the State of New York. She is sued in her individual capacity and official capacity as the Principal of Freeport Public School System. Ms. Gisselle Campbell-Ham may be held individually liable for discrimination in violation of the NYSHRL, NY Exec Law § 290 et seq., as either an employer under Executive Law § 296(1), or as an aider and abettor under § 296(6).

9.       Upon information and belief, defendant, DR. KISHORE KUNCHAM, is an individual residing in the State of New York. He is sued in his individual capacity and official capacity as the Superintended of Freeport Schools. Dr. Kishore Kuncham may be held individually liable for discrimination in violation of the NYSHRL, NY Exec Law § 290 et seq., as either an employer under Executive Law § 296(1), or as an aider and abettor under § 296(6).

10.     Upon information and belief, the defendant, MR. BENJAMIN ROBERTS, is an individual residing in the State of New York. He is sued in his individual capacity and official

capacity as the Assistant Superintendent of Personnel & Special Projects of Freeport Schools. Mr. Benjamin Roberts may be held individually liable for discrimination in violation of the NYSHRL, NY Exec Law § 290 et seq., as either an employer under Executive Law § 296(1), or as an aider and abettor under § 296(6).

## JURISDICTION & VENUE

11.    This Court has subject matter jurisdiction over the Plaintiff's NYSHRL claims pursuant to §290, et seq., and has original jurisdiction over the Title VII & ADA claims. See *Madison Park Owners Corp. v. Andrews, 23 Misc. 3d 1107(A)*.

12.    Jurisdiction in this civil action is proper in this Court pursuant to CPLR § 301 CPLR § 302 as the Defendants are registered to do business in New York, have a presence in New York, reside and regularly do business in this county and because a substantial part of the acts and omissions giving rise to this action occurred in New York.

13.    Venue in this civil action is proper in this Court pursuant to CPLR § 503.

14.    On or about August 29, 2022, Plaintiff served her original a Notice of Claim upon all Defendants.

15.    On or about October 12, 2022, Plaintiff was examined under oath pursuant to General Municipal Law §50(h).

16.    The present action was commenced within one year and ninety days of the subject occurrence.

17.    On September 6, 2023, after participating in a hearing for a pre-motion conference before the Hon. Joan M. Azrack, this Court ruled that within 30 days of the Order dated September 6, 20023, Plaintiff was to provide this amended complaint incorporating the changes discussed on the record during the conference.

## FACTS

18.    Ms. D'Aiello has been employed as a School Psychologist for Freeport High School ("Freeport") from February 2004 through the present, receiving what is likely the top grade salary for her position, as well as fringe benefits, health insurance, retirement benefits (i.e. 401K), etc.

19.    Prior to the November 8, 2021 incident, Ms. D'Aiello has always had a deep passion and zeal for her career and everyone in her circle of life knows her for being a passionate advocate for kids. She has been an adept professional who engages in a student/parent-centric style of teaching and a dexterous psychologist who finds true love for her work in delivering programs that aim to help parents assist their children in advancing and developing mental health and creating both appropriate and creative Individual Educational Plans ("IEPs").

20.    The IEPs, which she has always developed with true pleasure and satisfaction, empower children who may not have a desirable environment for growth and development and seek to provide a strong model for the child's long-term development, living, and learning.

21.    Prior to the November 8, 2021 event, the work environment often seemed supportive and welcoming to Ms. D'Aiello's passion and expertise. It was not until recently, characterized by an alarming turnover and changes in the school's administration that the welcoming and nurturing working environment for Ms. D'Aiello started taking a nosedive. For over 18 years, the school has had 9 principals and while each came along with some sort of change, the impacts the changes had on the school never reached the current status.

22.    In recent years, Ms. D'Aiello has noticed and experienced a substantial decline in the commitment the school once had to the students and the faculty. She has been privy to cases where the District has restricted services to students in need. All for the love of her work and kids, she has been personally subjected to hostility from parents as the school's security protocols became compromised under the watch of the administration. As a result, she has outright suffered

from physical injuries as students quarreled and, while meekly and silently being collateral damage, Ms. D'Aiello has been taking trips to a physician for check-ups because of physical bleeding that may have long-term and negative impacts on her health.

23.    The larger point is that the working environment has drastically changed and taken a turn to the worse from one that was welcoming, that which encouraged a strong bond between students, teachers, and parents, and that motivated Ms. D'Aiello to zealously carry out her duties and responsibilities to the learners, to a petty, misogynistic, and racist one with staff that is more concerned with protecting a paycheck as opposed to doing what is right for the children, parents, staff, and community.

24.    In light of these issues, it would appear that the change in the working culture and environment had finally boiled over and came to a hard stop for Ms. D'Aiello in November 2021.

**a. Initial Concerns.**

25.    On or about November 8, 2021, in a situation involving a 504 accommodation and a student with a disability, Ms. D'Aiello was informed that a student, known to suffer from depression and on medication for the same, had gone missing. The student's father contacted Ms. D'Aiello and, as expected, was very concerned.

26.    Unable to find the student by herself, Ms. D'Aiello sought the assistance of Dr. Aaron Johnson ("Johnson"), one of the Assistant Principals of Freeport, in accordance with protocol. Unfortunately, Dr. Johnson did not respond to Ms. D'Aiello's request and by the end of the day, she sent an email communication as a follow-up. When he finally responded, Dr. Johnson advised that he was sorry that he was not available, but in the future, Ms. D'Aiello should reach out to his "right hand," Ms. Tonda Jackson ("Jackson").

27.    On November 9, 2021, Ms. D'Aiello performed an assessment on the student, who by then had been found, and believed that he was in need of specialized services and treatment

from a psychiatrist. Following the assessment, Ms. D'Aiello and Ms. Melissa McCormack ("McCormack") from the Guidance Department arranged a hand-over with the student's father for further treatment. In accordance with the school's protocol, Ms. D'Aiello and Ms. McCormack brought the child to the security desk, and all were allowed to proceed to Mr. Johnson's office.

28.    Immediately they entered the office, Ms. Jackson said aloud – "**in comes Karen number one, and Karen number two.**" Upon hearing these comments, which were out rightly racist, Ms. D'Aiello and Ms. McCormack felt offended and frustrated but let the issue slide through until the meeting was over. In the best interest of the child and school, the meeting was concluded. However, immediately after that, **Ms. D'Aiello and Ms. McCormack reported the racist remarks to the union** and Ms. D'Aiello's **immediate supervisor, Ms. Wendy Haise ("Haise")**, a 12th Grade Assistant Principal.

**b. The November 19, 2021 Meeting.**

29.    A meeting took place on November 19, 2021 ("November Meeting"). In attendance were Ms. Wendy Haise (12th Grade Assistant Principal), Ms. Jackson, Ms. Patty Langan ("Langan"), the union representative, Ms. McCormack, Dr. Johnson, and Ms. D'Aiello.

30.    Before commencement, Ms. D'Aiello requested whether she could record the meeting. However, Ms. Jackson (the person who had made the racist remarks) opposed this request and even threatened to walk out of the meeting. Because of the respect owed to her superiors and for the sake of not making matters worse than they already were, Ms. D'Aiello accepted and agreed that the meeting would not be recorded at the time.

31.    The meeting started with Ms. Langan providing an explanation and a recount of events that took place when Ms. D'Aiello and Ms. McCormack entered Dr. Johnson's office. Right at that moment, **Ms. Jackson stood up and began to mock Ms. D'Aiello. She also started criticizing Ms. D'Aiello's voice and her manner of walking in front of all parties present. In**

fact, Ms. Jackson actually walked back and forth in the conference room, insulting Ms. D'Aiello, in front of her direct reports and those in attendance!

32.     Dr. Johnson, the direct supervisor of Ms. Jackson, failed to stop his junior's mockery, undesirable behavior, and demeaning words and actions – the point at which Ms. D'Aiello felt the need to address and defend herself. **Aside from the emotional distress and pain of being insulted, Ms. D'Aiello explained that she speaks loudly because she suffers from a hearing disability**. Unfortunately, this issue was already known to the school.[1], Ms. Jackson continued to mock Ms. D'Aiello's manner of speaking and seemed not to care that it resulted from a hearing disability.

33.     Plaintiff's hearing disability was known to the school and predate the incident when she was mocked and ridiculed for speaking loudly.

34.     Plaintiff has been suffering from a hearing disability on or about November 11, 2021.

35.     While defending herself from Ms. Jackson's mockery and ridicule, Ms. D'Aiello explained why the term "Karen" was offensive, why it was a "racist" remark, and why she and Ms. McCormack felt offended. Rather than apologizing and attempting to resolve the matter, Mr. Johnson seemed to defend the behavior by responding, **"This is not fairyland Ms. D'Aiello; this is Freeport."** Challenging this response, Ms. D'Aiello asked why he would make such a remark because while she had, herself, served the community for 18 years, Dr. Johnson had only been in Freeport for about 2 months since before this meeting. It is justifiable to wonder how a person who has lived in a place for merely a few months would understand its culture and the people who lived there.

---

[1] Our records show that Ms. D'Aiello first learned about her hearing impairment on or about November 11, 2021. She had shared documents with the union and principal at the time to disclose her hearing impairment. She has received treatment for her hearing impairment since its first onset.

36.     Immediately after, Ms. McCormack began speaking of how frustrated and emotionally offended she felt for being called a "Karen." However, before she could even catch her breath, **Dr. Johnson raised his hands at such close proximity to Ms. McCormack's face and said, "Stop this!" Immediately, Ms. McCormack flinched backward because of the proximity of Dr. Johnson's hands to her face. Shocked and due to sudden overwhelming fear and apprehension Ms. McCormack had to recoil and retreat to her seat**.

37.     Realizing that she was not getting anywhere with Dr. Johnson, Ms. McCormack went ahead to pull a record or an article from Google, but immediately, **an impatient Ms. Jackson resumed her earlier behavior of making hand gestures, mocking and ridiculing Ms. McCormack's manner of typing**.

38.     In her defense, Ms. Jackson denied using the term, but she was outrightly lying. Dr. Johnson, rather than admitting that Ms. Jackson had used the term in his office, went ahead to claim that the term "Karen" was not racist. In a self-serving and condescending way, Dr. Johnson proclaimed that he was a "*scholar of racism, had the facts, and everyone else only had opinions*." Standing up, he pounded his chest with his fist and verbalized again, "*I am the scholar on racism, I have a Ph.D. in it*."

39.     It was at this point that Ms. Langan called him **arrogant**. However, ignoring Ms. Langan, Dr. Johnson continued berating and rattling with regard to those who had been offended by Ms. Jackson's racist remarks. After several failed attempts to make him cool down, Ms. Langan eventually labeled his **behavior as misogynistic** and expressed her frustration in trying to speak to someone who was not willing to listen to others.

40.     Nonetheless, Ms. Jackson admitted that she did, in fact, make the racist remarks. She stated, "**For saying the word Karen, I will apologize.**" However, after apologizing, **Ms. Jackson sought to marginalize her own apology** by saying that "**she said it under her breath**"

**and "didn't look directly at [Elizabeth] or [Melissa], so it doesn't count**." While this was a cute way of marginalizing her apology and denying being a racist, one would wonder whether Ms. Jackson would be so nonchalant about it if someone ridiculed and referred to her using a racist term or she would just accept that it was muttered under breath.

41.     The issue that Ms. Jackson was Dr. Jackson's "right hand," who receives all information concerning administrative matters and works with her superior in running the school, also came up during the meeting. Considering that Dr. Johnson is often privy and exposed to tremendously sensitive and confidential information, such as credentialing, confidentiality, and communication protocols, the question of Ms. Jackson being a "right hand" posed a substantial risk of improper disclosure of privileged information to persons who do not have a need-to-know qualification.

42.     The fact that Dr. Johnson was not reachable in the event of a missing student was also questionable because a missing child would be a grave matter superseding almost every other issue in the school.

43.     As these issues came to light, Ms. Haise, seeking Dr. Johnson's approval, asked to permit Ms. Jackson to leave the meeting on the grounds that there was an admission and agreement to refer staff using their proper names moving forward. Dr. Johnson agreed and Ms. Jackson had to continue in her absence. With matters escalating, Dr. Johnson was subjected to multiple questions, including his unreachability during a crisis, not providing direct and clear communication about the student, and sharing all information with the office secretary.

44.     As tension continued to rise, Dr. Johnson became visibly angry and looked utterly frustrated. Ms. D'Aiello, being a trained psychologist, instinctively asked if Dr. Johnson wanted to take a break. However, probably out of fear of looking weak under her inferiors, especially Ms. D'Aiello, he refused to take a break and said, "**No, I got this**!" Even Ms. Haise began to notice the

tension and asked if Dr. Johnson needed a break, but, standing firm, he once again stated, "**I got this, we can continue**."

45.    Shortly after, Ms. Kathy Lamb (Ms. Haise's secretary) interrupted the meeting to share that Ms. Giselle Campbell-Ham ("Campbell-Ham"), the school's principal, needed both Dr. Johnson and Ms. Haise for an urgent matter. The meeting was adjourned without any conclusion or resolution.

46.    Following this meeting, it was shared through Ms. Langan that Mrs. Campbell-Ham was going to arrange a meeting where Dr. Johnson was prepared to apologize for his behavior to ease the tension between staff members and reassure everyone that such behavior would not reoccur.

47.    In order to memorialize the November Meeting, Ms. D'Aiello prepared a statement of facts on November 20, 2021 and submitted it to all in attendance.

**c.    The February 18, 2022 Meeting.**

48.    A meeting took place on February 18, 2022 ("February Meeting"). In attendance were Mr. Benjamin Roberts (Assistant Superintendent of Personnel & Special Projects), Ms. Langan, Mr. Chris Dressler ("Dressler") (union representative), Ms. McCormack, Ms. D'Aiello, Ms. Campbell-Ham, and Dr. Johnson.

49.    This meeting was apparently very aggressive and contentious. Mr. Roberts took the lead but was only provided with the facts as authored by Dr. Johnson and Ms. Campbell-Ham. Ms. Langan and Mr. Roberts were very combative, and it appeared that the parties had lost focus of the meeting.

50.    Ms. Campbell-Ham claimed that Dr. Johnson did not intentionally place his hands close to Ms. McCormack's face. She added that Dr. Johnson has long arms and when he speaks, he uses hand gestures (none of this is viable, however, because this is a professional setting, and it

is utterly improper to raise hands, causing apprehension to others). At this point, the fact that Dr. Johnson, a boss who raises his hands on junior female staff, still got his job is an issue of significant concern. Mr. Roberts seemed to doubt the distance of Dr. Johnson's hands to the face – which was questionable because, while he did not witness the events that gave rise to the initial concern, how could he realistically have an opinion about the proximity of the hands to the face?

51.    Mr. Roberts continued to question Ms. McCormack arbitrarily, with no sort of problem-solving method or strategy other than to simply victimize and shame her, all the while never bothering to inquire about her side of the story. In her spirit of advocacy, Ms. D'Aiello stepped in and implored Mr. Roberts to slow down. Deranged by his problem-solving tactics as an individual who had worked with those with disabilities for over 20 years, Ms. D'Aiello wondered how Mr. Roberts expected to resolve the matter with such an aggressive, hostile, erratic line of questioning. Notwithstanding the complete lack of due process and rights that Ms. McCormack had to be heard, Mr. Roberts showed no concern for her integrity as a woman. He did not even care about the fact that she was in fear of apprehension.

52.    Mr. Roberts ultimately conceded that he was not prepared to continue taking the lead of the meeting, agreed that he needed to do further due diligence, and would be contacting Ms. D'Aiello and Ms. McCormack for further follow-up. However, this was after verbally accosting Ms. D'Aiello and Ms. McCormack. The latter had to leave the meeting before its adjournment due to prior commitments. However, counselors in the guidance department advised against being allowed to take her car keys because, due to the distraught situation, she was emotionally and mentally distressed to drive.

53.    Afterward, there was no direct follow-up from Mr. Roberts (Assistant Superintendent of Personnel), as promised. Instead, he handed the matter off to Ms. Campbell-Ham, who sent an email asking for separate meetings - one for Ms. D'Aiello and another for Ms.

McCormack. Ms. Campbell-Ham also asked that Ms. Langan not participate in the meetings but for Mr. Dressler to attend instead.

54.    Ms. D'Aiello responded by way of an informal meeting advising that there was no need for another meeting, that the "truth" did not change, and rather, the truth had already been shared. **Ms. D'Aiello felt that Ms. Campbell-Ham attempted to divide Ms. D'Aiello and Ms. McCormack, tried to dismiss Ms. Langan** (the union representative who had been defending Ms. D'Aiello and Ms. McCormack)**, was being deceptive, and was bordering harassment. All truthful statements and facts were already formalized and placed on paper. Everything was already settled - the attempt to use the school system's infrastructure to further block and obstruct Ms. D'Aiello and Ms. McCormack's attempts to resolve the matter, the attempt to set up a meeting after meeting in this unusual war of attrition by Freeport, was really nothing but harassment and retaliation for their opposition to the discriminatory actions and racist remarks**.

**d.  The March 1, 2022 Meeting.**

55.    A meeting took place on March 1, 2022 ("March Meeting"). In attendance were Ms. Langan, Ms. McCormack, and Ms. Campbell-Ham. Melissa met with Ms. Campbell-Ham and Ms. Langan. Ms. McCormack demanded, for her and for Ms. D'Aiello, an acknowledgment of truth regarding what transpired during the November Meeting.

56.    Ms. Campbell-Ham stated that she could not compel anyone to apologize for something (which she certainly could) and pointed out that "**colleagues won't always see eye to eye on things**." Ironically, Dr. Johnson was not just an ordinary colleague but the Assistant Principal and the superior to Ms. McCormack. Again, the apology was not for a disagreement but rather for physically violating the sanctity of her space in a professional environment. **In effect, the issue is that Ms. McCormack made a report concerning the unethical behavior of Dr.**

Johnson, who is her superior. However, Ms. Campbell-Ham not only failed to take corrective action, but she also refused to do so.

57.     **Due to the constant anxiety suffered by Ms. McCormack, including the feeling that she works in a hostile environment, a sense of apprehension and fear from Dr. Johnson, and being insulted and referred to using racist terms, Ms. McCormack begged for closure from Ms. Campbell-Ham. Ms. McCormack begged for something – anything - some sort of remedial behavior taken against Dr. Johnson! It appears that Dr. Johnson did not even so much as suffer a negative performance review in his file - not a single thing was done to correct this**!

58.     To Ms. McCormack's disbelief, Ms. Campbell- Ham casually suggested she, Ms. McCormack, should seek someone to help her deal with her anxiety and that it is important to take care of our mental health and ourselves. Ms. McCormack was shocked and dismayed because of this response. Apparently, rather than the wrongful acts of Dr. Johnson being corrected, the victim was being advised to seek professional help. Unbelievable!

59.     At the end of the meeting, Ms. Campbell-Ham suggested that Ms. McCormack should meet with Dr. Johnson and Ms. Langan to "**work it out**." Under the circumstances, Ms. McCormack agreed. Notably, but not unsurprisingly, this meeting also never came to fruition. Both Ms. Campbell-Ham and Dr. Johnson simply had no time for this. On March 9, 2022, Ms. Langan sent an email to the parties to follow up. Mr. Roberts acknowledged receipt on March 10, 2022, and passed the follow-up request to Ms. Campbell-Ham. After March 10, 2022, after a period of no further communication until April 13, 2022, Ms. Langan sent an additional follow-up via email to the parties.

60.     On April 28, 2022, a Memorandum authored by Ms. Campbell-Ham was published and placed in the school mailboxes memorializing the November Meeting, but in a convoluted way

(the "April 28 Memo").. The April 28 Memo somehow portrays Dr. Johnson as the victim and not the hyper-aggressive, racist, and misogynistic abuser who should have been long fired by this point. While many false statements and inaccuracies had been made, unfortunately for Ms. D'Aiello, those who are in power always have the ability to create and rewrite history - and to quote Orwell, "*those who control the present, control the past and those who control the past control the future.*" It would appear Ms. Campbell-Ham understands such Orwellian methods well.

**D. The Individual Meetings With Union Representatives & Mr. Roberts.**

61.      A series of meetings began on or about May 5, 2022 in which Ms. McCormack and Ms. D'Aiello would individually meet with Mr. Roberts and Mr. Rob Fallot ("Fallot"), two union representatives. At some point, Mr. Fallot needed to leave and Ms. Langan and Mr. Dressler took over from the union's side.

62.      Based on these meetings, it appeared that Mr. Roberts did make an initial effort to take their concerns seriously; he noted that he needed to raise this up the chain and to speak directly with Dr. Kishore Kuncham, the Superintended of Freeport Schools ("Kuncham").

63.      At this time, Ms. McCormack prepared a formalized statement dated May 4, 2022, in which she formalized her side of the story to date.

64.      On June 7, 2022, Ms. D'Aiello and Ms. McCormack received a memorandum from Mr. Roberts summarizing his involvement in this matter and summarizing the November Meeting with Dr. Johnson.

65.      The summary, as provided in the Roberts Memo, was very vague and had several inaccuracies in it as well. Much of the pertinent information and critical details that were relevant to the incident had been left out or even probably intentionally omitted. To Mr. Roberts' convenience, the Roberts Memo concluded that the District had fully and appropriately addressed the matter.

e.  **The June 10, 2022 Meeting With Dr. Kuncham.**

66.    On June 10, 2022, a meeting (the "June Meeting") attended by Dr. Kuncham, Mr. Roberts, Ms. Haise, Ms. McCormack, Ms. Langan, Ms. D'Aiello, and Ms. Campbell-Ham was held.

67.    Ms. McCormack and Ms. D'Aiello were able to share what they considered and believed to be the most significant impacts of this matter. They pointed out that this was very serious, involved sensitive material, was unresolved and unaddressed, and as such, both Ms. McCormack and Ms. D'Aiello have suffered substantial mental anguish as a result of the District's failure to explore, discover, and resolve this matter in which their civil rights have been violated.

68.    Ms. McCormack and Ms. D'Aiello pointed out that they were physically and abused and emotionally traumatized by Dr. Johnson's behavior in the November Meeting. The impact of the initial attack was compounded by the District's failure to take appropriate actions to address Ms. McCormack's and Ms. D'Aiello's concerns for their safety, their job supervision and their overall work climate.

69.    Dr. Kuncham (rightfully) directly questioned how an apology for such behavior had not yet been provided. He directly questioned Ms. Haise, as a supervising Assistant Principal, to confirm what Ms. McCormack and Ms. D'Aiello shared. Ms. Haise confirmed.

70.    Furthermore, Dr. Kuncham asked Mr. Roberts and Mrs. Campbell-Ham why the apology hadn't been provided, reflecting upon the fact that they have been Dr. Johnson's direct supervisors.

71.    Ms. D'Aiello also pointed out that had she or Ms. McCormack used a racist term against a person of color, they would have immediately been reprimanded, been placed in the "rubber room," and potentially be in danger of losing employment and licensure.

72.     Ms. D'Aiello requested that Ms. Jackson be transferred to another school building and that an apology was no longer an acceptable resolution in light of how long this issue had been drawn out without resolution. After months and months of fighting and defending themselves, confronting this uphill battle individually, an apology was no longer sufficient.

73.     Ms. Campbell-Ham challenged how Ms. McCormack and Ms. D'Aiello experienced the incident, marginalized the impacts the situation had on both, and engaged in dismissive body language, such as eye-rolling, turning her head, avoiding eye contact, trying to interject, etc.

74.     Ms. D'Aiello said that Dr. Johnson needed Ms. Campbell-Ham's help and guidance since he lacked self-awareness in his undertakings and instead of helping him, Ms. Campbell-Ham continues to turn a blind eye to Dr. Johnson's lousy behavior.

75.     Dr. Kuncham said he would facilitate and be present at a meeting where Dr. Johnson would have apologized to both Ms. McCormack and Ms. D'Aiello formally. Ms. McCormack said that an apology was no longer suitable, and frankly, she was uncomfortable and nervous being in the same room as Dr. Johnson, based on the fact that he had raised his hand at her during a previous meeting. On her part, Ms. McCormack said she wanted a formal affirmation and confirmation that what Ms. McCormack and Ms. D'Aiello had been telling the entire time was the truth.

76.     At that point, the meeting was adjourned and pizza was offered - as if they were in a kindergarten and it was someone's birthday party celebration. Ms. D'Aiello, being sick to her stomach, respectfully declined the pizza, as she was fed up with everything she had gone through at the hands of Ms. Campbell-Ham at the meeting.

**f.  The Final Meeting Dated June 24, 2022.**

77.     A final meeting on June 24, 2022 took place (the "Final Meeting") in Ms. Campbell-Ham's Office. In attendance were Dr. Johnson, Ms. Giselle Campbell-Ham, Ms. Langan, Ms.

McCormack, Ms. D'Aiello, and Mr. Roberts. Ms. Campbell-Ham and Dr. Johnson were late to attend, and thus, Mr. Roberts, Ms. D'Aiello, Dr. Kuncham, Ms. McCormack, and Ms. Langan had to wait for them.

78.     As they waited for the two, Mr. Roberts apologized to Ms. D'Aiello and Ms. McCormack for not having direct contact with them throughout the process as he had previously promised. He took accountability for how his handoff to Ms. Campbell-Ham was wrong in hindsight, as this had led to Ms. D'Aiello and Ms. McCormack being further impacted and a resolution delayed for an unnecessary and prolonged period of time.

79.     It was evident that even despite 2 separate meetings that took 3 hours each between Dr. Kuncham and Dr. Johnson, all efforts in trying to set the tone for Dr. Johnson and trying to get him to take accountability for his inappropriate aggressive behavior were futile. By the start of the meeting, it seemed that Dr. Johnson was still clueless about his continued lack of awareness and did not care to understand the detrimental impact his behavior had had on Ms. D'Aiello and Ms. McCormack.

80.     To Ms. D'Aiello and Ms. McCormack's dismay, but which was no longer a surprise, Dr. Johnson once again continued to defend Ms. Jackson, continued to speak as if this was just a difference in perception of things, variation in feelings, and continuously referenced himself as having good intentions.

81.     Dr. Johnson continued to deny ever pounding his chest, as if this never happened, stating, "**What do you think I am, some primate?**" (Perhaps, suggesting that somehow, the District had started engaging in invidious racism against him). Dr. Johnson also denied swinging his hand in close proximity to Melissa's face. He proved defensive and argumentative, made some awkward, pointless reference to "**12 Angry Men**," and played a victim in a trial by jury.

82.    It was also evidenced that Ms. Campbell-Ham continuously tried to save Dr. Johnson from his own temper and position, and when he was heading in the wrong direction during his diatribe, she would turn him around and realign him. However, Ms. Campbell-Ham continued to defend his actions and refused to so much as acknowledge that he did anything wrong.

83.    Dr. Kuncham tried effortlessly to redirect Dr. Johnson and get him to take accountability and apologize. When it became painfully clear that an apology was not forthcoming from Dr. Johnson and he would never take accountability for his actions, Dr. Kuncham brought closure to the meeting.

84.    Upon exiting the meeting, because of the highly aggressive, toxic environment in that room, Ms. McCormack crouched down on the floor, against the wall, and began to have a complete panic attack. Ms. D'Aiello provided emotional support and waved Dr. Kuncham over for assistance. Dr. Kuncham encouraged Ms. McCormack to return to Ms. Campbell-Ham's Office, to which Ms. D'Aiello interjected and advised that she would take Ms. McCormack to a place where she could feel safe. Ms. D'Aiello escorted Ms. McCormack to her office to relax.

85.    After the meeting, going into the holiday weekend on July 1, 2022, Ms. D'Aiello reached out to Mr. Roberts and Mr. Kuncham to inquire about what further action needed to be taken and to seek monetary compensation for her emotional anguish, distress, suffering, and frustration. Simply put, monetary compensation is required in order to provide validation for her suffering. Ms. D'Aiello spent almost an entire year in a constant state of anxiety and frustration, dealing with the aggressive and abusive nature of Dr. Johnson, dealing with the disparaging comments and antics of Ms. Jackson, and all the while trying to maintain her composure, and continue to deliver a fantastic experience for her students. Ironically, the person in charge of ensuring that the children have the best learning and developmental experience, particularly those with disabilities, is having her own emotional and mental State crushed by Freeport.

86.    Unfortunately, Mr. Roberts out rightly denied the request for a proposed settlement offer, holding that this is "**not something that could be considered as a potential outcome**."

87.    Funny, one would wonder if that was the same position taken by Pan American International High School and the Department of Education when they paid out $1.1M in a similar race discrimination lawsuit. I guess it is time to find out.

**g.  Post July 1, 2022 Discriminatory Events**

88.    On or about August 30, 2022, Plaintiff was confronted by a Security Guard, Mr. Craig Cole, who made lewd and sexually suggestive gestures to Plaintiff. This was reported by Plaintiff, as she had made a report to the Defendant, but no disciplinary action was taken.  Ms. Plaintiff had to go to the superintendent's office for action and rather than take corrective action, Plaintiff was told to "stay for mandatory training." Another incident of a failure to take corrective action against staff, and a failure to provide Plaintiff the same protections they should presumably afford all employees.

89.    On or about August 31, 2022, noticing her numbers to her door were aggressively removed, Plaintiff reported this behavior to the Defendants and to date, the Defendants never made the proper repairs and the room numbers, to this date, are still without repair.

90.    On or about October 12, 2022, Plaintiff participated in a 50H deposition at Defense Counsel's Office.  The Defendants refused to permit Plaintiff to use one of her paid time off (PTO) days toward the deposition.  Plaintiff raised this issue with her union representative, Ms. Patty Langan, however to date, the Defendants continue to restrict Plaintiff from utilizing her PTO as a personal day.

91.    On or about November 5, 2022, Dr. Johnson was cited for antisemitic remarks against other teachers in the building. Dr. Johnsons' unhinged behavior continues, and the Defendants continue to fail to take any corrective action against him.

92.     On or about November 9, 2022, Plaintiff received verbal threats from invitees of the school, reports the behavior, and the school fails to take corrective action and deprives Plaintiff her right to a safe work environment, causing further apprehension.

93.     Plaintiff was asked to participate in "Restorative Justice Training," however due to the current situation with Dr. Johnson, Plaintiff began to have a bout of anxiety and continued apprehension. Plaintiff discussed her condition with the proctor of the training who recommended that Plaintiff leave the training seminar early.   Ms. Gisselle-Ham confronted Plaintiff and attempted to discipline her for leaving the training early.   Plaintiff opposed the improper disciplinary action, and involved her union representative, Ms. Patty Langan, to get involved on her behalf.

94.     As of February 1, 2023, Plaintiff began to start exhibiting physical sickness as a result of the excessive anxiety and apprehension.  Plaintiff began to take periodic breaks from work, to simply walk outside to ease her tension, and in retaliation, the Defendants increased their scrutiny against the Plaintiff, ignoring her need for an accommodation, and began improperly targeting her for unnecessary disciplinary actions.

95.     On February 15, 2023, the Defendants have failed to implement parameters and boundaries needed to protect the licenses of their psychological staff.  As of the date of this Amended Complaint, the Defendants ability to ensure that the licensing requirements of the Plaintiff, and other psychologists, within the school system, are in question, which puts Ms. D'Aiello at risk of losing her licensing, a task one performed by the Defendants.

96.     On or about March 23, 2023, a parent arrived unannounced at the school, and marched unexpectedly to Ms. D'Aiello's office, without security escorting them. Such failure to take corrective action, and failure to provide the Plaintiff with a safe work environment, only causes further apprehension and is done in part to the retaliatory acts taken against her.

97. On July 14, 2023, Plaintiff reported to management of the abysmal conditions her current office has been left in. As of the time of this Amended Complaint, Ms. D'Aiello's office is filled with mold, mildew, fungus, blistering paint, dampness and an unsightly smell—all of which has not been corrected, nor addressed, by the Defendants. Plaintiff contends that this lack of any concern for her health and safety is only in further retaliation for her opposition to the discriminatory treatment she has received.



*(Water Damage Present In Office – Left – Mold and Mildew Setting In - Right)*



*(Mold Mites, Larvae of Worms beginning to form in the cracks, failure to make repairs evident)*

98. Since the first incident of discrimination on November 9, 2021, through the present, Plaintiff has suffered through a treatment amount of discriminatory treatment, all of which is blatant, without apology, and in her face, predicated on her race (Caucasian) and disability, and

that her race and disability, are motivating factors in the Defendant's discriminatory treatment of Plaintiff.

99.    To date, Plaintiff has record of no less than **51 separate incidents** of discrimination, harassment and retaliation—whether it is suffering discriminatory commentary based on race or disability, a hostile work environment, physical apprehension and fear, a failure to take corrective action to stop the discrimination, retaliation and retaliatory treatment, a denial of the basic job necessities such as a clean work environment without toxic mold, mildew and fungus, without obscene smells and odors, without the threat of physical violence from invitees, all the meanwhile Dr. Johnson goes unscathed for his offensive, hostile and discriminatory actions and behavior, all of which is aided and abetted by Ms. Gisselle-Ham, as she protects Dr. Johnson, and Dr. Kuncham, who is terrified of facing Dr. Johnson.

100.   More than just being called a "Karen" – the invidious and discriminatory commentary is pervasive through the school, is systemic and are unhinged.  Plaintiff's complaints of race and disability discrimination is more than just a motivating and/or determinative factor in Defendant's discriminatory and retaliatory treatment of Plaintiff, including without limitation continued and growing hostility, and continued apprehension and intimidation, but rather, it has become a systemic way of life for the Defendant school system.

101.   Ironically, the Defendant appears to make light of the "Karen," comment, but somehow, when it was reported that the Assistant Director called someone an "Uncle Tom" in April 2023, Alice Kane considered it a "hate crime."  To the Defendants, it would appear that being called an *Uncle Tom*, defined in Oxford as a person regarded as betraying their cultural or social allegiance, is worthy of police involvement, but being called a "*Karen*" which is defined by

Dictionary.com[2] as a pejorative slang term for an obnoxious, angry, entitled, and racist middle-aged white woman who uses her privilege to get her way is acceptable in the workplace.  But I guess I'm not surprised considering the systematic racism, disgust, and hate toward Caucasian people in the Freeport School System.

102.    As a direct and proximate result of the discriminatory and retaliatory conduct of Defendant, Plaintiff has in the past incurred, and may in the future incur, a loss of earnings and/or earning capacity, loss of benefits, pain and suffering, embarrassment, humiliation, loss of self-esteem, mental anguish, and loss of life's pleasures.

103.    For clarification, while the Defendants are under the impression that the invidious, systemic and outright disgusting discrimination, harassment and intimidation from Dr. Johnson, as aided and abetted by the Defendants, seem to be of no moment, and are completely disregarded, the fact of the matter is that as a result of the stress and anxiety, Ms. D'Aiello began to suffer from the onset of dysphagia, of which is caused the substantial anxiety she has suffered—on top of her already concerning hearing impairment and general anxiety disorder.

104.    The plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory acts unless and until this Court grants the relief requested herein.

105.    Defendant acted with malice and/or reckless indifference to Plaintiff's protected rights. Even when given the opportunity on multiple occasions, the Defendants couldn't even so much as punish Dr. Johnson, who was the original source of all the discriminatory and harassing treatment.  At a bare minimum, any reasonable person would have believed that Mr. Johnson and

---

[2] https://www.dictionary.com/e/slang/karen/ last accessed on September 13, 2023.

Ms. Jackson should be punished, but alas, the Defendants appear have applied a "Ostrich" approach to disciplinary measures, putting their head in the sand and praying that it just goes away.

106.    The conduct of Defendant, as set forth above, was outrageous and warrants the imposition of punitive damages against Defendant.

**FIRST CAUSE OF ACTION**

**RACE DISCRIMINATION (CAUCASIAN) IN VIOLATION OF THE NYSHRL AGAINST FREEPORT HIGH SCHOOLS, THE FREEPORT SCHOOL DISTRICT, AARON JOHNSON, GISSELLE CAMPBELL-HAM, DR. KISHORE KUNCHAM & MR. BENJAMIN ROBERTS.**

107.    Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

108.    At all relevant times hereto, Plaintiff was an "employee" within the meaning of the NYSHRL, and Defendants were an "employer(s)" within the meaning of the NYSHRL.

109.    As outlined above, Defendant violated the NYSHRL when it discriminated against Plaintiff by making racist remarks because of her race. On November 9, 2021, Ms. Jackson referred to Ms. D'Aiello as a "Karen". At the time Plaintiff was worried about dealing with the situation of a missing child and chose to not address the comment. However, after Plaintiff reported the racist remarks to the union and to her immediate supervisor, Ms. Haise. Defendant has done nothing to rectify the discrimination Plaintiff has faced.

110.    Contrary to the position of the Defendants, the discriminatory treatment suffered by the Plaintiff is far beyond the "Karen" commentary, but rather, the invidious and discriminatory commentary that is pervasive through the school, is systemic and are unhinged.  Plaintiff's complaints of race and disability discrimination is more than just a motivating and/or determinative factor in Defendant's discriminatory and retaliatory treatment of Plaintiff, including without

limitation continued and growing hostility, and continued apprehension and intimidation, but rather, it has become a systemic way of life for the Defendant school system.

111.    The NYSHRL provides for vicarious liability for an employee who did not directly participate in unlawful discrimination where they "aid, abet, incite, compel or coerce" the commission of any acts forbidden by the respective statutes. See NY Exec. Law § 296(6).

112.    Defendants were aware and condoned the discriminatory conduct of Dr. Johnson and as such, have aided and abetted in the discriminatory treatment of the Plaintiff.

113.    The discriminatory treatment of the Plaintiff find itself at the core of the actions of discrimination and retaliation under the NYSHRL.

114.    Plaintiff communicated with the individual defendants on numerous occasions about the discriminatory treatment she has suffered, has been suffering and continues to suffer to date, including reporting such actions to her union representative, but to date, no corrective action was taken, and that further discriminatory conduct ensued.

115.    As a direct and proximate result of Defendant's discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, for which Plaintiff is entitled to an award of damages, attorney's fees, and costs.

116.    As a direct and proximate result of Defendant's unlawful conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress, anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of damages, attorney's fees, and costs.

117.    Defendant's unlawful actions constitute bad faith, malicious, willful, and wanton violations of Plaintiff's rights, for which Plaintiff is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION

**DISABILITY DISCRIMINATION (ANXIETY & HEARING IMPAIRED) IN VIOLATION OF THE NYSHRL AGAINST FREEPORT HIGH SCHOOLS, THE FREEPORT SCHOOL DISTRICT, AARON JOHNSON, GISSELLE CAMPBELL-HAM, DR. KISHORE KUNCHAM, & MR. BENJAMIN ROBERTS.**

118.    Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

119.    At all relevant times hereto, Plaintiff was an "employee" within the meaning of the NYSHRL, and Defendant was an "employer" within the meaning of the NYSHRL.

120.    As outlined above, Defendant violated the NYSHRL when it discriminated against Plaintiff by allowing one of its employees to mock and ridicule Plaintiff because of her hearing disability. Ms. Jackson repeatedly mocked and ridiculed Ms. D'Aiello because she spoke with a loud voice due to her hearing disability. Defendant did nothing to stop the discrimination.

121.    A hearing defect is a physical impairment pursuant to the Human Rights Law and qualifies as a disability for purposes of §§ 296, 292. See *State Div. of Human Rights v. Averill Park Cent. Sch. Dist.*, 59 A.D.2d 449 (1977)

122.    As a direct and proximate result of Defendant's unlawful conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress, anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of damages, attorney's fees, and costs.

123.    Defendant's unlawful actions constitute bad faith, malicious, willful, and wanton violations of Plaintiff's rights, for which Plaintiff is entitled to an award of punitive damages

## THIRD CAUSE OF ACTION

**RETALIATION IN VIOLATION OF THE NYSHRL AGAINST FREEPORT HIGH SCHOOLS, THE FREEPORT SCHOOL DISTRICT, AARON JOHNSON, GISSELLE CAMPBELL-HAM, DR. KISHORE KUNCHAM, & MR. BENJAMIN ROBERTS.**

124.    Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

125.    At all relevant times hereto, Plaintiff was an "employee" within the meaning of the NYSHRL, and Defendant was an "employer" within the meaning of the NYSHRL.

126.    As outlined above, Defendant violated the NYSHRL when it continued to maintain a hostile work environment because Plaintiff engaged in activity protected by the NYSHRL. Ms. Jackson mocked and ridiculed Ms. D'Aiello. She spoke with a loud voice because of her hearing disability. Defendant was aware that Plaintiff had a hearing disability and continued to allow Ms. Jackson to ridicule her and did nothing to stop her. Ms. Jackson was not so much as reprimanded for discrimination against Plaintiff. Plaintiff begged for closure and not even a negative performance review was added to Ms. Jackson's file.

127.    Contrary to the position of the Defendants, the discriminatory treatment suffered by the Plaintiff is far beyond the "Karen" commentary, but rather, the invidious and discriminatory commentary that is pervasive through the school, is systemic and are unhinged.  Plaintiff's complaints of race and disability discrimination is more than just a motivating and/or determinative factor in Defendant's discriminatory and retaliatory treatment of Plaintiff, including without limitation continued and growing hostility, and continued apprehension and intimidation, but rather, it has become a systemic way of life for the Defendant school system.

128.    The NYSHRL provides for vicarious liability for an employee who did not directly participate in unlawful discrimination where they "aid, abet, incite, compel or coerce" the commission of any acts forbidden by the respective statutes. See NY Exec. Law § 296(6).

129.    Defendants were aware and condoned the discriminatory conduct of Dr. Johnson and as such, have aided and abetted in the discriminatory treatment of the Plaintiff.

130.    The discriminatory treatment of the Plaintiff finds itself at the core of the actions of discrimination and retaliation under the NYSHRL.

131.    Plaintiff communicated with the individual defendants on numerous occasions about the discriminatory treatment she has suffered, has been suffering and continues to suffer to date, including reporting such actions to her union representative, but to date, no corrective action was taken, and that further discriminatory conduct ensued.

132.    As a result of the Plaintiff's objection to the discriminatory treatment, the Defendants have failed to take corrective action to rectify the discrimination, have failed to make corrections to the mold, mildew, fungus and water damage, likely causing long and short term physical injury to the plaintiff, have put the Plaintiff at risk of injury due to their failure to provide basic security and protection from parents and invitees, have refused to permit plaintiff to take her already earned and vested days off, and so forth.

133.    As a direct and proximate result of Defendant's retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, for which Plaintiff is entitled to an award of damages, attorney's fees, and costs.

134.    As a direct and proximate result of Defendant's retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress, anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of damages, attorney's fees, and costs.

135.    Defendant's unlawful actions constitute bad faith, malicious, willful, and wanton violations of the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

## FOURTH CAUSE OF ACTION

### RACE DISCRIMINATION (CAUCASIAN) IN VIOLATION OF TITLE VII AGAINST FREEPORT HIGH SCHOOL AND THE FREEPORT SCHOOL DISTRICT

136.    Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

137.    At all relevant times hereto, Plaintiff was an "employee" within the meaning of Title VII, and Defendant was an "employer" within the meaning of Title VII.

138.    As outlined above, Defendant violated Title VII when it discriminated against Plaintiff by making racist remarks because of her race. On November 9, 2021, Ms. Jackson referred to Ms. D'Aiello as a "Karen". At the time Plaintiff was worried about dealing with the situation of a missing child and chose to not address the comment. However, after Plaintiff reported the racist remarks to the union and to her immediate supervisor, Ms. Haise. Defendant has done nothing to rectify the discrimination Plaintiff has faced. Several meetings have taken place in which Plaintiff was not afforded a sincere apology; at this time an apology is no longer enough. If Plaintiff had said a racist remark she would have been punished immediately.

139.    Contrary to the position of the Defendants, the discriminatory treatment suffered by the Plaintiff is far beyond the "Karen" commentary, but rather, the invidious and discriminatory commentary that is pervasive through the school, is systemic and are unhinged.  Plaintiff's complaints of race and disability discrimination is more than just a motivating and/or determinative factor in Defendant's discriminatory and retaliatory treatment of Plaintiff, including without limitation continued and growing hostility, and continued apprehension and intimidation, but rather, it has become a systemic way of life for the Defendant school system.

140.    Plaintiff communicated with the individual defendants on numerous occasions about the discriminatory treatment she has suffered, has been suffering and continues to suffer to date, including reporting such actions to her union representative, but to date, no corrective action was taken, and that further discriminatory conduct ensued.

141.    As a direct and proximate result of Defendant's discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, as well severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress, anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of damages, attorney's fees, and costs.

### FIFTH CAUSE OF ACTION

### RETALIATION IN VIOLATION OF TITLE VII AGAINST FREEPORT HIGH SCHOOL AND THE FREEPORT SCHOOL DISTRICT

142.    Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

143.    At all relevant times hereto, Plaintiff was an "employee" within the meaning of Title VII, and Defendant was an "employer" within the meaning of Title VII.

144.    As outlined above, Defendant violated Title VII when it retaliated against Plaintiff by allowing for tension to build up and creating a hostile work environment because Plaintiff engaged in activity protected by Title VII. On November 9, 2021, Ms. Jackson called Ms. D'Aiello and Ms. McCormack  - "Karen number one and Karen number two" loudly in the office when Ms. D'Aiello was following protocol of bringing a missing child to the office. In  the best interests of the school and the child, Ms. D'Aiello let it slide. After the meeting, Ms. D'Aiello and Ms. McCormack reported the racist remarks to the union and to Ms. D'Aiello's immediate supervisor,

Ms. Haise. On November 19, 2021 there was meeting to discuss the racial discrimination Plaintiff had incurred. In the meeting, Plaintiff was continually discriminated against because of her disability. Dr. Johnson did not want to hear what Plaintiff had to say and raised his hands at such close proximity to Ms. McCormack's face and said "stop this!" Ms. McCormack flinched and was shocked due to the sudden overwhelming fear and apprehension. Subsequent. Meetings were held to discuss the matter but to no avail. Due to the constant anxiety suffered to Ms. McCormack, including the feeling that she works in a hostile environment, a sense of apprehension and fear of Dr. Johnson and being insulted and referred to using racist terms, she begged for closure and for action to be taken against Dr. Johnson and Ms. Jackson. Defendant failed to stop the discrimination and continued to maintain a hostile work environment.

145.    Plaintiff communicated with the individual defendants on numerous occasions about the discriminatory treatment she has suffered, has been suffering and continues to suffer to date, including reporting such actions to her union representative, but to date, no corrective action was taken, and that further discriminatory conduct ensued.

146.    As a result of the Plaintiff's objection to the discriminatory treatment, the Defendants have failed to take corrective action to rectify the discrimination, have failed to make corrections to the mold, mildew, fungus and water damage, likely causing long and short term physical injury to the plaintiff, have put the Plaintiff at risk of injury due to their failure to provide basic security and protection from parents and invitees, have refused to permit plaintiff to take her already earned and vested days off, and so forth.

147.    As a direct and proximate result of Defendant's retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, as well severe mental anguish and emotional distress, including, but not limited to, depression,

humiliation, embarrassment, stress, anxiety, loss of self-esteem and self-confidence, and emotional

pain and suffering, for which Plaintiff is entitled to an award of damages, attorney's fees, and costs.

148.    Defendant's unlawful actions constitute bad faith, malicious, willful, and wanton

violations of Plaintiff's federally protected rights, for which Plaintiff is entitled to an award of

punitive damages.

## SIXTH CAUSE OF ACTION

### DISABILITY DISCRIMINATION (ANXIETY & HEARING IMPAIRED) IN VIOLATION OF THE ADA AGAINST FREEPORT HIGH SCHOOL AND THE FREEPORT SCHOOL DISTRICT

149.    Since November 11, 2021 through the present, Plaintiff has been physically

impaired due to her diagnosis of a hearing impairment.

150.    Defendant failed to communicate with Plaintiff meaningfully and in good faith

concerning her disability. Defendant knew that Plaintiff was hearing impaired and spoke with a

loud voice due to this disability. Defendant did nothing to stop the discrimination Plaintiff faced

by one of their employees.

151.    Defendant discriminated against Plaintiff in violation of the ADA by allowing one

of their employees (Ms. Jackson) to mock and ridicule her loud voice because of her hearing

disability.

152.    Defendant knowingly and intentionally discriminated against Plaintiff because of

her disability.

153.    It is without question that an individual who is suffering from a hearing impairment

has a qualified disability under the ADA. *Rothschild v. Grottenthaler*, 716 F. Supp. 796, 797

(S.D.N.Y. 1989)

154.    Defendant is liable for the acts and omissions of its agents and employees.

155.    Plaintiff suffered injuries as a result of Defendant's failure to rectify the discrimination Plaintiff faced. Ms. Jackson was not punished or even as much as reprimanded for mocking Plaintiff's disability.

156.    Defendant's failure to address the discrimination Plaintiff faced because of her hearing disability was the direct and proximate cause of Plaintiff's injuries, damages, and losses.

157.    Defendant acted with malice or reckless indifference to Plaintiff's federally protected rights under the ADA.

## SEVENTH CAUSE OF ACTION

## RETALIATION IN VIOLATION OF THE ADA AGAINST FREEPORT HIGH SCHOOL AND THE FREEPORT SCHOOL DISTRICT

158.    Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

159.    As a direct result of Plaintiff's opposition to conduct prohibited by the ADA, Defendant retaliated against Plaintiff by allowing tension to build up and creating a hostile work environment.

160.    Defendant treated Plaintiff less favorably than her similarly situated counterparts who did not engage in protected activity. Defendant allowed Ms. Jackson to discriminate against Plaintiff by not so much as reprimanding Ms. Jackson for mocking Plaintiff's disability. An apology was not afforded to Plaintiff, at this time an apology is no longer acceptable.

161.    Defendant interfered with Plaintiff in the exercise and enjoyment of her rights under the ADA by creating a hostile work environment in which an employee could mock and ridicule Plaintiff because of her hearing disability and get away with it.

162.    Defendant is liable for the acts and omissions of its agents and employees. Defendant, either directly or by and through its agents, retaliated against Plaintiff and caused her injuries, damages, and losses.

163.    Defendant's retaliatory conduct was the direct and proximate cause of Plaintiff's injuries, damages, and losses.

164.    Defendant's conduct was with malice or reckless indifference to Plaintiff's federally protected rights under the ADA.

## PRAYER FOR RELIEF

165.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of a career and the loss of a salary, bonuses, benefits and other compensation which such employment entails, out-of-pocket medical expenses and Plaintiff has also suffered future pecuniary losses, emotional pain, Suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

*WHEREFORE* Plaintiff respectfully requests that this Court enter judgment containing the following relief:

a.   A declaratory judgment that the actions, conduct and practices of the Defendants complained of herein constitute an unlawful employment practice and are in violation of the ADA, Title VII, and the NYSHRL and that the defendant has harassed, discriminated against, and retaliated against Plaintiff,

b.   An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees and representatives, and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and/or practices complained of herein;

c.  An award of damages against Defendants for an amount to be proven at trial, plus interest, to compensate for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation and other benefits of employment;

d.  An award of damages against Defendants for an amount to be proven at trial, plus interest, to compensate for all non-monetary and compensatory damages, including but not limited to, compensation for plaintiff's mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and emotional distress;

e.  An award of damages against Defendants for an amount to be proven at trial, plus interest, for any and all other monetary and non-monetary losses suffered by plaintiff, including, but not limited to, reputational harm and harm to professional reputation;

f.  An award of punitive damages against Defendants for an amount to be determined by a jury;

g.  Prejudgment and post-judgment interest on all amounts due;

h.  An award of costs that Plaintiff incurred in this action, including, but not limited to, Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and

i.  Such other and further relief as the Court may deem just and proper.


## **JURY DEMAND**

The Plaintiff hereby demands a trial by jury in this matter.

Respectfully submitted,


Dated:     September 19, 2023
           New York, New York
                                    _
                                    Vincent Miletti, Esq.
                                    The Law Firm of Vincent Miletti, Esq.
                                    10 Halletts Point, Suite 1742
                                    Astoria, New York 11102
                                    (609) 353-6287

vmiletti@milettilaw.com
*Counsel to Plaintiff Elizabeth D'Aiello*

To:  Adam I. Kleinberg
Sokoloff Stern, LLP
179 Westbury Avenue
Carle Place, New York 11514
(516) 334-4500
akleinberg@sokoloffstern.com

Daniel R. Axelrod
Sokoloff Stern, LLP
179 Westbury Avenue
Carle Place, New York 11514
(516) 334-4500
daxelrod@sokoloffstern.com

Lewis Silverman
Silverman & Associates
445 Hamilton Ave, Suite 1102
White Plains, NY 10601
(914) 574-4510
lsilverman@silvermanandassociatesny.com

## VERIFICATION

STATE OF NEW YORK     )
                        )
COUNTY OF NEW YORK  )

      Ms. ELIZABETH D'AIELLO hereby attests, affirms, verifies, deposes and says that she is the

Plaintiff in this matter, that she has read the foregoing Verified Amended Complaint and that she believes

that the facts set forth therein are true and correct to the best of her knowledge, information, and belief. Ms.

ELIZABETH D'AIELLO's knowledge or information and belief are based on personal knowledge of the

facts of this case.

_____
ELIZABETH D'AIELLO

Sworn to me, the undersigned, before

This __18__ day of _September_ 2023.

_____
NOTARY PUBLIC

**PAULA MILLS**
**NOTARY PUBLIC STATE OF NEW YORK**
**NASSAU COUNTY**
**LIC. #01MI4819000**
**COMM. EXP.** February 28 2027

## CERTIFICATE OF SERVICE

I certify that this document is being filed through the Case Management / Electronic Case Filing (CM/ECF) system, which serves counsel for other parties who are registered participants as identified on the Notice of Electronic Filing (NEF). An electronic copy of the foregoing was sent via CM/ECF to all parties. Any counsel for other parties who are not registered participants is being served by first-class mail on the date of electronic filing.

_____
Vincent Miletti, Esq.