UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FOR ONLINE PUBLICATION ONLY

---------------------------------------------------------------------X

ELIZABETH D'AIELLO,

Plaintiff,

-against-

FREEPORT HIGH SCHOOLS, THE FREEPORT SCHOOL DISTRICT, DR. AARON JOHNSON, MS. GISSELLE CAMPBELLHAM, DR. KISHORE KUNCHAM and MR. BENJAMIN ROBERTS,

Defendants.

---------------------------------------------------------------------X

**MEMORANDUM & ORDER**
23-cv-00577 (JMA) (SIL)

FILED
CLERK
10/20/2026 12:06 pm
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**AZRACK, United States District Judge:**

Plaintiff Elizabeth D'Aiello brings this action against Defendants Freeport High Schools, the Freeport School District, Giselle Campbell-Ham, Dr. Kishore Kuncham, Benjamin Roberts, (collectively "Defendants" or the "Freeport Defendants") and Dr. Aaron Johnson, asserting claims of (1) discrimination on the basis of race in violation of the New York State Human Rights Law ("NYSHRL") and Title VII of the Civil Rights Act of 1964 ("Title VII"); (2) discrimination on the basis of disability in violation of the NYSHRL and the Americans with Disability Act ("ADA"); (3) retaliation in violation of Title VII, the NYSHRL, and the ADA; and (4) negligent infliction of emotional distress, civil assault, battery, and apprehension in violation of state law. (See ECF No. 17 ("Am. Compl.").) Before the Court are two motions for summary judgment, one by defendant Dr. Aaron Johnson, and the other by the remaining defendants.

For the reasons set forth below, the Freeport Defendants' motion is GRANTED as to all federal claims alleged by Plaintiff. The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims.[1]

## I. BACKGROUND

The following facts are taken from the Freeport Defendants' Rule 56.1 Statement, (ECF No. 57-24 ("DSOF")); Plaintiff's Counterstatement, (ECF No. 60-3 ("PSOF")); the Freeport Defendants' Response to Plaintiff's 56.1 Counterstatement (ECF No. 57-64 ("Def. Resp.")), and the evidentiary materials cited therein. Unless otherwise noted, each fact is either undisputed or the opposing party has not pointed to evidence to contradict it.[2]

### A. The Relevant Record at Summary Judgment

Before laying out the relevant facts, the Court must first address certain issues concerning the evidentiary record before the Court and the parties' 56.1 statements.

First, the record for the Freeport Defendants' motion is more than 3,000 pages. The parties are responsible for citing relevant evidence in their 56.1 Statements. When a party's 56.1 statement or response to a 56.1 statement cites to record evidence that does not support the assertions made by a party for that particular paragraph, the Court may disregard the relevant factual assertion and is not required to scour the voluminous record for that party.

---

[1] Because the Court dismisses D'Aiello's claims under federal law, the Court declines to exercise supplemental jurisdiction over D'Aiello's state law claims. See 28 U.S.C. § 1367(c)(3); see also Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n. 7 (1988), abrogated on other grounds by Royal Canin U.S.A., Inc. v. Wullschleger, 604 U.S. 22, 39–41 (2025) ("[I]n the usual cases in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state law claims."). Since the Court is declining to exercise supplemental jurisdiction over Plaintiff's state law claims, the Court will remand those claims back to Supreme Court, Kings County.

[2] Because no genuine dispute of material fact exists as to D'Aiello's federal claims, see infra Part II, and because the Court declines to exercise supplemental jurisdiction over D'Aiello's state law claims, see supra n.1, this section does not address those facts disputed solely between D'Aiello and Johnson, against whom only state law claims are asserted.

Second, the parties' responses to the Rule 56.1 statements are riddled with substantive argumentation. When a party's response to a 56.1 Statement fails to specifically controvert the fact in question and cite to relevant evidence, the fact is deemed if the assertion in the 56.1 statement is supported by admissible record evidence. Santander Consumer USA, Inc. v. City of Yonkers, No. 22-cv-8870, 2024 WL 4817649, at *1 (S.D.N.Y. Nov. 18, 2024) (citing Mae v. Quickway Estates LLC, No. 22-cv-3048, 2023 WL 6162927, at *1 n.2 (S.D.N.Y. Sept. 21, 2023)).

Third, and relatedly, Plaintiff's 56.1 Statement includes a section of "Additional Statements of Fact that Are In Dispute." (PSOF at 68.) However, rather than setting forth specific factual assertions that Plaintiff contends are disputed or undisputed, this section includes numerous questions such as "Did Dr. Johnson['s] hostile behavior put Ms. McCormack, as well as others in reasonable apprehension of physical fear of violence?" This is improper. The Court will not consider any such paragraphs in the 56.1 Statement, which often improperly include multiple such questions (along with numerous factual assertions) in a single paragraph.[3]

Fourth, at the conclusion of Plaintiff's 56.1 Statement, she cites to Plaintiff's Exhibit Y, a chart apparently compiled by counsel that purportedly lists "all of the factual issues that were raised in the depositions." (PSOF ¶ 188.) The Court declines to consider Exhibit Y, which is not admissible evidence. The Court will not consider purported factual issues that are not properly raised and identified in Plaintiff's 56.1 Statement.

Fifth, Plaintiff's brief includes numerous factual assertions that are not found in Plaintiff's 56.1 Statement. This is a failure to comply with Local Rule 56.1(b) and, as such, the Court may disregard such factual assertions. See Schwartz v. Allstate Ins. Co., No. 20-cv-79, 2023 WL 2742059, at *2 (E.D.N.Y. Mar. 31, 2023).

---

[3] In any event, in an abundance of caution, the Court has also considered and reviewed the evidence cited in these paragraphs of Plaintiff's 56.1 Statement and none of that evidence warrants denying summary judgment on the federal claims.

### B. Facts

Plaintiff Elizabeth D'Aiello, a white woman, was employed as a school psychologist at Freeport High School ("Freeport" or "the School") for approximately two decades, from February 2004 until her resignation in November 2024. (PSOF ¶¶ 2–3.) Defendant Dr. Aaron Johnson was employed as Freeport's Assistant Principal from August 2021 until his resignation in October 2024. (Id. ¶¶ 8–9.) Defendant Gisselle Campbell-Ham has been employed as Freeport's Principal since 2021. (Id. ¶ 6.) Defendant Benjamin Roberts is the District Assistant Superintendent for Personnel and Special Projects. (Id. ¶ 7.) Defendant Dr. Kishore Kuncham served as the District Superintendent from July 2009 until his retirement in August 2024. (Id. ¶ 10.)

#### 1. The "Karen" Comment

This case arises from a November 9, 2021 comment by Tondra Jackson, who was Johnson's secretary. On that day, D'Aiello and guidance counselor Melissa McCormack entered Johnson's office to discuss an issue involving a student. (Id. ¶ 11.) When they entered, Jackson, Johnson's secretary, made a comment, "Here comes Karen 1 and Karen 2." (Id. ¶ 12.) D'Aiello heard Jackson make some comment, but did not hear its substance. (Id. ¶ 13; see also D'Aiello Tr. 115:2–24, ECF No. 57-29.) After they left, McCormack told D'Aiello what Jackson had said. (PSOF ¶ 15.) D'Aiello understood the term "Karen" to be a derogatory term for white women. (Id. ¶ 17.) Both McCormack and D'Aiello are white women. (Id. ¶ 14.)

D'Aiello and McCormack spoke to Freeport's Assistant Principal, Wendy Haise, about the comment that same day. (Id. ¶ 16.) At one point, union representative Patricia Langan—who is also the head of the Freeport Teachers Association union—joined the conversation. (Id. ¶ 21.) Langan reported the comment to Principal Campbell-Ham. (Id. ¶ 23.)

### 2. The November 19, 2021 Meeting

Campbell-Ham arranged a meeting to discuss the "Karen" comment, to be supervised by Haise. (Id. ¶ 27; D'Aiello Tr. 120:16–23.) D'Aiello, McCormack, Johnson, Langan, Haise, and Jackson were present at the meeting; Campbell-Ham, Roberts, and Kuncham were not. (PSOF ¶¶ 27-28.)

At the start of the meeting, according to D'Aiello, Jackson "made fun of" D'Aiello by mimicking her way of speaking and mannerisms, including "how loud I am" and the "way I walk." (Id. ¶ 30; D'Aiello Tr. 133:12–19, 135:14–23.) D'Aiello testified at her deposition that she was diagnosed with a hearing impairment before the November 19, 2021 meeting but does not recall when. (PSOF ¶¶ 65–66.) D'Aiello testified that she believed Jackson's mocking during the November 19 meeting was related to her disability, although she is unsure if Jackson was aware of her disability at the time. (Id. ¶¶ 69–72.)

D'Aiello told Jackson her behavior was inappropriate and asked her to stop, after which Jackson stopped.[4] (PSOF ¶ 32; D'Aiello Tr. 137:10–12.) At the meeting, Jackson apologized for saying the word "Karen." (PSOF ¶ 34.) D'Aiello testified at her deposition that she was satisfied with Jackson's apology. (Id. ¶ 35.) Jackson left and the meeting continued. (Id. ¶ 36.)

[4] At her deposition, D'Aiello testified that she could not recall if she was wearing a hearing aid on November 19, 2021 and could also not recall when she was fitted for a hearing aid. (D'Aiello Tr. 103–104.) D'Aiello's 56.1 Statement asserts that Paragraph 7 of her affidavit indicates that her hearing aid is visible. (PSOF ¶ 67.) Paragraph 7 of her affidavit, however, does not support this assertion and does not even reference a hearing aid. D'Aiello's 56.1 Statement also asserts that page 122 of Langan's deposition testimony indicates that "Plaintiff's hearing impairment was common knowledge among those who worked with her." (PSOF ¶ 67.) That page of Langan's testimony, however, does not indicate that it was common knowledge, on November 19, 2021, that D'Aiello had a hearing impairment or that Jackson was aware of that impairment prior to her allegedly mocking behavior. Langan did subsequently testify that D'Aiello "often starts meetings" by "explaining that she has a hearing disability," but admitted that she was only assuming that this had occurred during a meeting with Jackson, and had "no basis in fact for that assumption." (Langan Tr. 126–27.) In any event, even assuming arguendo, that there is a factual dispute as to whether Jackson was aware of D'Aiello's hearing impairment when she began allegedly mocking, summary judgment would still be granted to Defendants on the federal claims.

The parties continued to discuss the term "Karen." Johnson, a trained Diversity, Equity, and Inclusion ("DEI") professional, expressed his view that the term "Karen" was not grounded in race, but rather, was a "pejorative" or "disrespectful" term (Id. ¶¶ 37-38; see also Johnson Tr. 225:18–23, ECF No. 57-33.) Langan interjected and said the term was "sexist," "mean," "unprofessional," and "could be perceived as racist." (Id. ¶¶ 39; see Langan Tr. 127:19–22, ECF No. 57-36.) At one point, Langan told Johnson that he was a misogynist and was arrogant. (PSOF ¶ 50.) Johnson told Langan that he was the scholar on racism, and Langan "only had opinions but he had facts." (Id. ¶ 45; Langan Tr. 129:16–20.)

The meeting began to devolve. At some point, D'Aiello tried to explain why she was upset about the situation with the student that preceded the "Karen" comment. (PSOF ¶ 40.) Langan interjected and said the group should "deal with one situation at a time." (Id.; Langan Tr. 128:8–9.) Johnson "got very loud and angry" and started yelling over others. (Id. ¶ 54; Langan Tr. 128:12) Johnson pounded his chest several times. (PSOF ¶ 46.) While Johnson was talking about how he was a "scholar," McCormack tried to "intercede" and point out "sources" that defined the term "Karen." (McCormack Tr. 107–108, ECF No. 57-35.) Johnson then put his hand in front of her face, about one or two inches from her face. (Id.)

At one point, Langan and Haise encouraged Johnson to take a break to calm down. (PSOF ¶ 54.) At one point during this meeting, Johnson stated to D'Aiello, "This is not fairyland, Ms. D'Aiello, this is Freeport."[5] (Id. ¶ 55.)

[5] After the meeting, D'Aiello looked up the term "fairyland." Based on this subsequent research, she understood the term "fairyland" to reference a historical amusement park in Kansas that discriminated against people of color. (Id. ¶ 56.) D'Aiello believed Johnson's use of the term "fairyland" was a discriminatory remark directed at her as a white woman in the community. (Id. ¶ 59; see D'Aiello Tr. 168:2-4.)

The meeting ended after Jackson reported to Campbell-Ham that Johnson was being verbally attacked. (PSOF ¶ 61.) Campbell-Ham then called Haise's secretary to tell Johnson to leave. (Id. ¶¶ 62–63.) The entire meeting lasted about 40 minutes. (Id. ¶ 64.)

### 3. The District's Investigation and D'Aiello's Complaint

After the November 19th meeting, Campbell-Ham initiated an investigation into the "Karen" comment and the meeting itself. (Id. ¶ 81.) As part of that investigation, Campbell-Ham interviewed Jackson, Johnson, D'Aiello, McCormack and Haise. (Id. ¶ 82.) On February 18, 2022, another meeting was held, attended by Johnson, D'Aiello, McCormack, Campbell-Ham, Langan, Roberts, and union representative Chris Dressler. (Id. ¶ 86.) The parties shared their perspectives on the November 19th meeting and, at the conclusion of the meeting, Roberts "informed all participants that the Freeport Public Schools expects all District employees to interact and demonstrate the highest levels of professionalism and respect when performing their work duties, at all times." (Id. ¶ 87–90.)[6] Campbell-Ham also met individually with D'Aiello. (Id. ¶ 91.)

On April 28, 2022, Campbell-Ham issued a memorandum summarizing her investigation and finding, among other things, that Langan and Johnson disputed the meaning of the term "Karen"; that the debate escalated to the point that participants were talking over one another; and that the meeting "spiraled out of control" without effective moderation or anyone to diffuse the

[6] Plaintiff's 56.1 Statement does not dispute these paragraphs of Defendants' 56.1 Statement. Defendants' 56.1 Statement also later recounts a June 7, 2022 memorandum issued by Roberts that discusses what occurred at this meeting. Plaintiff's 56.1 Statement contends Robert's memorandum did not accurately summarize what occurred at this meeting. (See PSOF ¶ 105(c)). However, none of the evidence cited in paragraph 105(c) of the PSOF supports any of the factual assertions Plaintiff makes therein.

situation, leaving D'Aiello and McCormack "disappointed and dissatisfied" with the outcome.[7] (Id. ¶ 92.) After Campbell-Ham issued the memorandum, Roberts scheduled follow-up meetings with D'Aiello, McCormack, and their union representatives. (Id. ¶ 95.)

On May 24, 2022, D'Aiello filed an internal Title VII complaint against Jackson, Johnson, Campbell-Ham, and Roberts. (Id. ¶ 97.) D'Aiello checked the box for "Other/Not Sure" as the basis of the complaint and wrote, "District to follow up to name calling and aggression on communication." (Id. ¶¶ 96–97.) D'Aiello did not check the box for "Race, color, creed, national origin" as the basis for the complaint. (Id. ¶ 98.) McCormack also filed a Title VII complaint that did not check that box, but did reference alleged "aggressive gestures, aggressive communication, and name calling/mocking behavior." (Id. ¶ 100.)

Assistant District Superintendent Dr. Alice Kane conducted a Title VII investigation into the charges brought by D'Aiello and McCormack. As part of the investigation, Kane met with D'Aiello, McCormack, Jackson, Campbell-Ham, Roberts, and additional witnesses provided by D'Aiello. (Id. ¶¶ 102–103.)

Kane also met privately with Johnson, in a meeting that he secretly recorded. (Id. ¶ 103; Pl. Ex. AA.)

[7] Quoting this memorandum, Paragraph 94 of the Defendant's 56.1 Statement asserts that "Campbell-Ham observed that 'The two individuals who were offended should have been talking with one another and telling Ms. Jackson how her alleged comment was hurtful and made them feel disrespected.'" (PSOF ¶ 94.) In the PSOF, D'Aiello denies this assertion "as to the actual facts," pointing to Langan's deposition testimony about a different issue. (Id.) In the cited testimony, Langan testified that when she discussed the alleged "Karen" comment with Campbell-Ham, Campbell-Ham told Langan, "Well, they are kind of Karens," and laughed. (Langan Tr. 75; PSOF ¶ 94.).) Langan's testimony does not indicate that she ever relayed this comment or conversation to D'Aiello. This testimony is not referenced again in D'Aiello's 56.1 statement or her brief and neither of those filings explains the purported relevance of this statement by Campbell-Ham to D'Aiello's claims The Court notes that in Plaintiff's Ex. Y—an improper filing that the Court will not consider— Plaintiff asserts that this statement "shows that [Campbell-Ham] did not take the situation seriously and was dismissive of the situation from the beginning, siding with Johnson and could indicate preferential treatment." (Pl. Ex. Y.) Even if the Court were to consider this improperly raised argument and factual assertion, Defendants are still entitled to summary judgment because Plaintiff was not subjected to any adverse actions or to a "severe or pervasive" hostile work environment even taking this comment into account.

On June 7, 2022, Roberts issued a memorandum summarizing his investigation. (Id. ¶¶ 104–106.) In June 2022, D'Aiello met, on two occasions, with Roberts, Langan, and Campbell-Ham to discuss her complaint. (Id. ¶¶ 107–09.) Johnson attended one of these meetings; at this meeting, he did not apologize. (Id. ¶ 109.)

On August 8, 2022, Kane issued a report which summarized the investigation and concluded, among other things, that (1) the harassment complaints were unfounded and did not meet the criteria for workplace harassment; (2) that Campbell-Ham and Roberts held multiple meetings and made efforts to resolve the matter; (3) that Jackson had apologized following the comment and was dismissed from the November 19th meeting; (4) that Johnson's conduct during the November 19th meeting was unprofessional but did not rise to the level of harassment; and (5) that subsequent interactions between Johnson and Jackson and D'Aiello had been professional and cordial. (Id. ¶ 112.) Kane's report also found that, after the November 19 meeting, D'Aiello's interactions with Jackson were minimal.[8] (Id. ¶ 112(c).)

Later in August 2022, Roberts issued a counseling memo to Johnson regarding his conduct during the November 19th meeting and recommended that he seek guidance on addressing difficult situations in the future. (Id. ¶¶ 113–117.)

D'Aiello alleges no further incidents with Johnson for at least two years following the November 19th meeting. During the 2023-2024 school year, Freeport announced a lockdown drill, during which teachers and staff must lock their doors. (Id. ¶¶ 122–123.) D'Aiello's door was unlocked when the School announced the drill. (Id. ¶ 124.) Johnson, who was the administrator assigned to D'Aiello's office for lockdown drills, checked her door, and, seeing it was unlocked, told her to lock it. (Id. ¶¶ 125–126.) D' Aiello responded that she understood and Johnson then

[8] Plaintiff's 56.1 Statement contends that she was still required to interact with Jackson to perform her job and that "the lack of clear protocol for engagement with Jackson's office" caused her "extreme angst and anxiety." (PSOF ¶ 112(c).) However, none of the evidence Plaintiff cites supports this factual assertion, which, even if true, would add little to Plaintiff's claims.

left her office. (Id. ¶ 128.) Johnson's entry was "discomfiting" to D'Aiello and "triggered feelings of trauma." (Id. ¶ 126.) D'Aiello asserts that the School should have had protocols in place to prevent Johnson from being assigned to her room for this drill. (Id. ¶ 121.) At some point, Campbell-Ham apologized to D'Aiello and told her that she had forgotten that D'Aiello's office had been moved and had forgotten to reassign Johnson to a different location. (D'Aiello Tr. 386–87.)

D'Aiello also alleges that another incident occurred with Johnson at some point in 2024. (PSOF ¶¶ 131–133.) D'Aiello had gone to the office to tell Campbell-Ham that a student with a mental health issue needed to go to the emergency room. (D'Aiello Tr. 314–15.) D'Aiello entered through a side door after knocking and when she entered the office she saw that all the assistant principals were having cake for someone's retirement. (Id.) When she entered, Johnson said that she "walked in the wrong door." (Id.) According D'Aiello, that remark was "verbally aggressive" and caused her "panic." (PSOF ¶¶ 131–33.)

Plaintiff's 56.1 Statement asserts that Johnson engaged in unspecified "race-based discriminatory commentary on numerous occasions," citing to Langan's deposition testimony. (PSOF ¶ 138(a)(iii).) At her deposition, Langan—who, again, is the head of the Freeport Teachers Association union—testified that Johnson refers to her as "the mob boss." (Langan Tr. 179; see also Johnson Tr. 20.) At her deposition, Langan explained that, as an "Irish Italian American,"

she was offended by these comments.[9] (Langan Tr. 179.)

On October 31, 2024, Johnson resigned from the District. (Id. ¶ 137.)

Prior to Johnson's resignation, he was accused of making anti-Semitic remarks and "things of that nature."[10] (Campbell-Ham Tr. 242; see also id. 190.) At her deposition, Campbell-Ham testified that Johnson was removed from his DEI role because of these accusations, explaining that "it would be unwise of the district to have someone who's being put under investigation to be in charge of [DEI]." (Id. at 242.)

### 4. Other Alleged Adverse Actions

D'Aiello alleges that at some point during the 2020-2021 school year she asked to be moved to an office with a window. (Id. ¶ 138.) Campbell-Ham told D'Aiello that none were available but that she would be placed on the list if one opened. (Id. ¶ 139.) At the end of the 2022 school year, another employee retired, leaving an office with a window. (Id. ¶ 140.) Campbell-Ham told D'Aiello she would have priority for the office once the employee moved out in the summer of 2022. (Id. ¶¶ 142–143.). After file cabinets were removed in preparation for the

---

[9] While Johnson's use of the term "mob boss" is not explicitly mentioned anywhere in Plaintiff's 56.1 Statement, Plaintiff discusses this point at numerous points in her brief. At both his deposition (and in a recording of a conversation between Johnson and Kane), Johnson repeatedly refers to Langan as a "mob boss." (See. e.g., Johnson Tr. 101; see Pl Ex. AA.) At his deposition, Johnson also referred to Langan as "Thanos," a villain from the Marvel comic book movies. (Johnson Tr. 187–88.)

D'Aiello's deposition and affidavit do not reference Johnson's "mob boss" comments and there is no evidence in the record indicating that she considered the "mob boss" comment to be discriminatory. In her December 2, 2024 resignation letter (which is discussed infra), D'Aiello does mention that she ultimately "received tapes and transcripts in which I heard [Johnson] mocked me, my colleague [McCormack], and my Union Representative," Langan. (Pl. Ex. D; see also D' Aiello Aff. ¶ 55(g), ECF No. 60-1.) The letter, however, does not explicitly mention the "mob boss" comments. According to the letter, in these recordings, Johnson "used phrases like 'clipping wings,'" "referred to us keeping in our lanes," and accused of these three women of 'baiting and switching' and whatever other fancy slogans were shared at a meeting." (Pl. Ex. D.) The letter does generally allege that the environment at the High School is "toxic" and that "my friends and coworkers . . . have been harassed, slandered, and harmed." (Id.) Prior to this resignation letter, on October 22, 2024, Langan had sent an email to the District, D'Aiello, McCormack, and others that complained (on behalf of the two women) about "disturbing and disparaging comments made by building and central administrators captured on recordings of an assistant principal and in the transcripts of an official deposition." (D'Aiello Aff. ¶ 50.)

[10] Plaintiff's brief and 56.1 Statement (and the specific evidence cited therein) reference this accusation, but do not identify what Johnson was actually alleged to have said or provide any admissible evidence of the alleged statements.

move, damage to the wall behind them was discovered. (Id. ¶ 144.) The District submitted a maintenance work order, and custodians left the damaged wall exposed for repairs. (Id. ¶¶ 145–146.). Before the work order was completed, D'Aiello saw the office and became upset. (Id. ¶ 147.) She photographed the damage, submitted a work request, and eventually verbally complained to the Superintendent. (Id. ¶¶ 147–149.). Repairs were made the day after she complained to the Superintendent.[11] (Id. ¶ 153.)

Plaintiff also complains that her office was mildewy and gross and there was "some black stuff" on the wall. (D'Aiello Tr. 276.)

D'Aiello also alleges that, in September 2023, she requested a different air conditioner, as her old air conditioner picked up background noise, which interfered with her ability to hear. (PSOF ¶ 76; see D'Aiello Tr. 276:5–10, 341–346). She claims her request was initially ignored and that she "felt targeted" as a result. (PSOF ¶ 76.) However, she gives no timeline or evidence of any delay and admits that no one denied her the new air conditioner she requested. (Id. ¶¶ 159–160.)

D'Aiello's 56.1 statement also asserts that she was subjected to other purported adverse actions, including that: she requested a list of room numbers for her department, which she was provided "only after waiting for a year;" she requested new furniture and was "treated to a delayed response"; and she "was denied participation in conferences, professional development opportunities, and essential access required to perform her duties," citing as an example that she

[11] In addressing this incident in her 56.1 Statement, Plaintiff generally references her 30-page affidavit, but does not cite to any specific pages or paragraphs. (See PSOF ¶¶ 148, 149, 152.) The Court will not sift through a voluminous record for Plaintiff. The only specific evidence cited in these paragraphs is one page of Plaintiff's deposition that does not support the factual assertions she makes in these paragraphs. In her brief, Plaintiff cites to one page of her deposition transcript concerning the repairs made to her office. This testimony indicates that the wall was patched within a week and Plaintiff does not point to any evidence suggesting otherwise. (See D'Aiello Tr. 275–276.)

was "denied the opportunity to support grieving students" after the death of a student.[12] (Id. ¶¶ 154–161.)

### 5. D'Aiello's November 2024 Resignation

On November 7, 2024—after Johnson had already left the District—D'Aiello submitted a letter resigning from her position at Freeport, effective December 4, 2024, explaining that she would "be accepting a position in the DOE to support my mental health, be closer to home and accommodate my familial needs." (Id. ¶ 164.) Her November 7, 2024 letter makes no reference to the "Karen" comment, the November 19th meeting, or any subsequent meetings. (Id. ¶ 165.) The next month, on December 2, 2024, D'Aiello submitted another resignation letter, which stated, among other things, that she was "engaged in a disturbing meeting after being called a 'Karen' by a secretary"; that the meeting "was marked by physical aggression on the part of an administrator and an open mocking of my disability by his secretary"; that she felt ignored and dismissed by Campbell-Ham and other administrators; that the school created an environment that was "atrocious and disgusting, rather than address the fact that Dr. Johnson was a monster"; and that she was "no longer able, mentally and physically, to have this fight" and had "no choice but to leave." (Id. ¶ 166; see also ECF No. 60-8.)

---

[12] For many of these allegations, Plaintiff's 56.1 Statement does not cite any relevant admissible evidence. The Court declines to consider any such allegations. For example, in paragraph 162 of her 56.1 Statement, Plaintiff asserts that:

> She was denied participation in conferences, professional development opportunities, and essential access required to perform her duties. For example, she was denied the opportunity to support grieving students, and her concerns related to the community school were consistently ignored. Supporting grieving students after the tragic death of their classmates was entirely valid and important, yet her efforts in this regard were disregarded.

(PSOF ¶ 161.) In support, Plaintiff cites to paragraph 53 of her affidavit, which does not support this assertion and, instead simply, states, in conclusory fashion, that "[a]t this point . . . I have had enough. I was no longer able to remain an employee there due to the severe and pervasive hostile work environment, the double standards, the discriminatory treatment, and preferential treatment of other simply because of their discriminatory animus." (D'Aiello Aff. ¶ 53.) Plaintiff also cites to her December 2, 2024 Resignation Letter, which is not admissible evidence of any of the factual claims made therein and, in any event, does not address the specific allegations above.

### C. Procedural History

On January 9, 2023, D'Aiello commenced this action by filing a complaint in New York State Supreme Court, Kings County, naming as Defendants Freeport High Schools, the Freeport School District, Campbell-Ham, Johnson, Kuncham, and Jackson. (ECF No. 1, Ex. A.) On January 26, 2023, Defendants filed a Notice of Removal. (ECF No. 1.) On September 30, 2023, D'Aiello filed an Amended Complaint removing Jackson as a defendant. (ECF No. 17.) Currently pending before the Court are motions for summary judgment filed by the Freeport Defendants and Johnson. (ECF No. 57, ECF No. 58.)

## II. DISCUSSION

The Freeport Defendants move for summary judgment on the basis that D'Aiello fails to establish a prima facie case of discrimination and retaliation under Title VII and the ADA. (See ECF No. 57.) In a separate summary judgment motion, Johnson argues, among other things, that the Court should decline to exercise supplemental jurisdiction over D'Aiello's state law claims against him. (See ECF No. 58.)

Because the Court concludes that on the record presented, considered in the light most favorable to D'Aiello, no reasonable jury could find in her favor on her Title VII and ADA discrimination and retaliation claims, those claims are dismissed in their entirety. The Court declines to exercise supplemental jurisdiction over D'Aiello's state law claims and remands those claims back to state court. (See supra n.1.)

### A. Summary Judgment Standard

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Capitol Recs., LLC v. Vimeo, Inc., 125 F.4th 409, 418 (2d Cir. 2025) (quoting Fed. R. Civ. P. 56(a)). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such

that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008). In considering a summary judgment motion, the Court "is required to view the record in the light most favorable to the party against which summary judgment is contemplated and to resolve all ambiguities and draw all factual inferences in favor of that party." NetJets Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 178 (2d Cir. 2008). If the moving party meets its burden of demonstrating the absence of a disputed issue of material fact, then the burden shifts to the nonmoving party to present "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e); see also Sheet Metal Workers' Nat'l Pension Fund v. Accra Sheetmetal, LLC, 993 F. Supp. 2d 245, 248 (E.D.N.Y. 2014). The nonmoving party cannot rely solely on "conclusory allegations or unsubstantiated speculation" to defeat a motion for summary judgment. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

### B. Burden of Proof in Discrimination and Retaliation Claims

D'Aiello's claims of disability and race discrimination, as well as retaliation, are subject to the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Kirkland v. Cablevision Sys., 760 F.3d 223, 225 (2d Cir. 2014); McMillan v. City of New York, 711 F.3d 120, 125 (2d Cir. 2013); McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 96 (2d Cir. 2009). Under the McDonnell Douglas framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination, after which the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its conduct. McDonnell Douglas, 411 U.S. at 802. If the defendant successfully meets that burden, the burden then shifts back to the plaintiff to demonstrate that the defendant's reason "was a pretext or discriminatory in its application." Id. at 807.

### C. D'Aiello's Title VII Discrimination Claims Fail.

#### 1. Title VII discrimination

Title VII provides, in relevant part, that it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race[.]" 42 U.S.C. § 2000e-2(a)(1). "[A]n unlawful employment practice is established when the complaining party demonstrates that race . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

To establish a prima facie case of employment discrimination under Title VII, a plaintiff must show that: "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination.'" Bart v. Golub Corp., 96 F.4th 566, 569 (2d Cir. 2024) (quoting Banks v. Gen. Motors, LLC, 81 F.4th 242, 270 (2d Cir. 2023)).

An adverse employment action is a decision that "brought about some 'disadvantageous' change in an employment term or condition." Muldrow v. City of St. Louis, 601 U.S. 346, 354 (2024). In Muldrow, the Supreme Court held that a plaintiff bringing a Title VII discrimination claim "does not have to show . . . that the harm incurred was significant[,] . . . serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." Id. at 355. "Rather, the plaintiff only needs to show 'some harm respecting an identifiable term or condition of employment'—i.e., the plaintiff must have been 'left [ ] worse off' but not necessarily 'significantly so.'" Reid v. Metro One Loss Prevention Servs. Grp. (Guard Div. NY), Inc., No. 23-cv-6303, 2025 WL 2533377, at *8 (E.D.N.Y. Sept. 3, 2025) (quoting Muldrow, 601 U.S. 346 at 355, 359). "That said, even under Muldrow, some workplace events that are unpleasant are not necessarily adverse employment actions." Mitchell, 745 F. Supp.3d at

91 (citing Rios v. Centerra Group LLC, 106 F.4th 101, 112-13 (1st Cir. 2024)); see also Rios, 106 F.4th at 112-113 ("a mere admonition by a supervisor without any formal consequences is not an adverse employment action because it does not represent any disadvantageous change in the terms or conditions of the plaintiff's employment")).

If a plaintiff fails to proffer evidence showing she was subject to an adverse employment action, summary judgment dismissing the claim is appropriate. See, e.g., Fuller v. Instinet, Inc., 120 F. App'x 845, 847 (2d Cir. 2004) (affirming summary judgment on Title VII claims in light of plaintiff's failure to identify any adverse employment action).

**2. D'Aiello has not suffered any adverse employment action for her Title VII discrimination claims.**

D'Aiello identifies several purportedly adverse acts, including: (1) "race-based discriminatory commentary targeted toward Caucasians," specifically pointing to Jackson's "Karen" comment and Johnson's "fairyland" statement; (2) aggressive behavior and intimidating remarks from Johnson; (3) the School "foster[ing] an environment" where discrimination could occur; and (4) the School favoring its non-white employees during the investigation and failing to apply its non-harassment/discrimination policy equally. (ECF No. 57-63 ("Pl. Opp.") at 17–18.)[13] D'Aiello argues that, as a result of these acts, she has suffered emotional distress and stress-related physical distress, such as digestive issues; damage to her personal reputation; professional harm from not being able to get her work done; and financial harm from medication expenses and from needing to take medical leaves from work. (Id. at 18–19.)

[13] D'Aiello also alleges that she was subjected to "mocking" because of her hearing impairment; that the School retaliated against her by, inter alia, failing to properly respond to her complaints; that she endured a hostile work environment; and that she was constructively discharged when the discrimination forced her to resign and accept a lower-paying job. (See Pl. Opp. at 17–19). Those allegations will be addressed in the sections on ADA discrimination (infra II.D), retaliation (infra II.E), hostile work environment (infra II.F), and constructive discharge (infra II.G), respectively.

Even under the more generous Muldrow standard, none of these alleged acts constitute an actionable adverse employment action.

Plaintiff contends that the various comments at issue—including "Karen," "Fairyland," "mob boss," and the "wrong door" are—along with Johnson's aggressive behavior, themselves adverse actions. This argument fails. These comments and related conduct are not adverse actions. Even accepting D'Aiello's version of events—and assuming, without deciding, that a jury could find that the "Karen," "Fairyland," and "mob boss" comments were related to race and ethnicity—the comments cited by D'Aiello (and Johnson's related aggressive behavior) do not constitute adverse employment actions. "[M]ere comments do not materially affect employment." Phillip v. Dep't of Sanitation, No. 16-cv-2412, 2019 WL 1004588, at *9 (E.D.N.Y. Feb. 28, 2019) (quoting Teachout v. N.Y.C. Dep't of Educ., No. 04-cv-945, 2006 WL 452022, at *13 (S.D.N.Y. Feb. 22, 2006)); see id. ("[V]erbal abuse is typically insufficient to constitute an 'adverse employment action' because [negative] or otherwise insulting statements are hardly even actions, let alone adverse actions."). Id. (citations omitted). D'Aiello suffered no reduction in pay, benefits, title, responsibilities, career prospects, or any other identifiable term or condition of her employment. Although the remarks may have been "unpleasant" to her, that alone does not constitute a materially disadvantageous change in employment sufficient to qualify as an adverse action. Mitchell, 745 F. Supp. 3d at 91; see also Basak v. New York State Dep't of Health, 9 F. Supp. 3d 383, 391 (S.D.N.Y. 2014) (assertedly insulting comments, "whether laced with discriminatory animus or simply hurtful or offensive, do not themselves amount to an adverse employment action"); see also Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 570 (2d Cir. 2012).

Plaintiff also cites to the instance when Johnson walked into her office during the lockdown drill and the other incident when he told her she had gone through wrong door. (See PSOF ¶¶

122–128; 131–133.). These are precisely the type of "mere inconveniences" (if they can even be called that) that are not actionable under Title VII. Brooks v. Doe Fund, Inc., No. 17-cv-3626, 2020 WL 13659079, at *13 (E.D.N.Y. Mar. 31, 2020); see also id. ("At most, as with all of Plaintiff's other complaints, these acts amount to mere inconveniences and trivial harms that are not actionable under Title VII.").[14]

Relatedly, Plaintiff alleges that she was subjected to various purported adverse actions in connection with the District's alleged failure to investigate and adequately respond to Plaintiff's complaints about the "Karen" comment, Johnson's conduct at the November 19 meeting, and his other behavior. Specifically, Plaintiff alleges that the school: (1) "fostered an environment where its supervisory staff, particularly Dr. Johnson, engages in race-based" discriminatory comments and failed to take corrective action; (2) treated non-Caucasians were treated more favorably during the investigation of her complaints, where a decision was allegedly made before the investigation was completed; and (3) failed to equally apply the District's anti-discrimination policy, which prohibits mocking, derogatory remarks, and demeaning comments. (Pl. Opp. at 17.)

Some of these arguments appear to be more appropriately considered in connection with Plaintiff's hostile work environment claim. In any event, while Plaintiff insists that the instances above are also separately actionable adverse actions, the Court disagrees.

As an initial matter, D'Aiello's claim that the School discriminatorily applied its anti-discrimination/anti-harassment policy and failed to adequately investigate her claims is speculative. Although she claims that the school treated her unfairly in investigating the comments and made its decision "even before the investigation was completed," (Pl. Opp. at 17), she provides

[14] As discussed infra, the Court has also considered all the comments and other conduct cite above in connection with her hostile work environment claim. Ultimately, even when taken together, all these comments and other conduct are not sufficiently severe or pervasive to constitute a hostile work environment. See, e.g., Pattanayak v. Mastercard Inc., No. 21-cv-2657, 2022 WL 564047, at *6 (S.D.N.Y. Feb. 24, 2022), aff'd, No. 22-cv-1411, 2023 WL 2358826 (2d Cir. Mar. 6, 2023) ("[C]onduct [that] has not actually altered the conditions of the victim's employment" does not support a claim for hostile work environment under [Title VII]").

no support for that claim.[15] Following the November 19th meeting, the School held at least four additional meetings to address D'Aiello's and McCormack's concerns, and multiple officials conducted internal investigations into the complained-of behavior. Although these measures did not satisfy D'Aiello and D'Aiello continued to believe the investigations and the District's response were flawed, the objective, undisputed facts do not suggest a failure to conduct a proper investigation. See also infra II.E (discussing the Title VII investigation in the context of D'Aiello's retaliation claims).

In any event, even assuming arguendo that the School's investigation and response was inadequate, flawed, or even tainted by bias, the record here does not establish that this constitutes an adverse action.

Prior to Muldrow, courts often found that "the failure to investigate a discrimination claim is not an adverse employment action." Pang v. Cushman & Wakefield, No. 20-cv-10019, 2022 WL 19410316, at *6 (S.D.N.Y. Aug. 23, 2022), report and recommendation adopted sub nom., Pang v. Cushman & Wakefield U.S., Inc., 2023 WL 2644267 (S.D.N.Y. Mar. 27, 2023), aff'd sub nom. Pang v. Ye, No. 23-cv-713, 2024 WL 1298553 (2d Cir. Mar. 27, 2024); see also Hayes v. Kerik, 414 F.Supp.2d 193, 203 (E.D.N.Y. 2006); Sesay-Harrell v. NYC Dep't of Homeless Servs., No. 12-cv-925, 2013 WL 6244158, at *15 (S.D.N.Y. Dec. 2, 2013). D'Aiello's allegations concern the type of "standard disciplinary measures, supervisory inaction, and typical workplace

[15] D'Aiello's allegations in support of this claim are conclusory and do not support her claim that the investigation was biased. She relies primarily on statements made by Kane during conversations with Johnson in the course of investigating D'Aiello's Title VII complaint (as reflected in audio recordings of those conversations made by Johnson, (see ECF 60-31 (Pl. Ex. AA)). Specifically, D'Aiello argues that Kane's statements to Johnson that "I don't believe that I'm going to be able to find that they use that criteria" (regarding the criteria for harassment), as well as her comment that "This entire process is confidential," demonstrate bias, show that Kane had predetermined the outcome in Johnson's favor, and reflect a broader preference for African-American employees over Caucasian employees, given that Johnson is African-American (see, e.g., Pl. Op. at 23 (citing ECF No. 60-31 at 3); PSOF ¶¶ 1, 81, 103, 111). These assertions are purely speculative. Neither statement evidences favoritism toward Johnson or discriminatory animus toward D'Aiello. Notably, Kane ultimately concluded that Plaintiff's complaints did not rise to the level of workplace harassment and, as explained infra, this Court has similarly concluded that, even when considering the evidence in the light most favorable to Plaintiff, a jury could not find that she was subjected to a hostile work environment.

procedures," which, prior to Muldrow, did not constitute adverse employment actions. Sesay-Harrell, 2013 WL 6244158, at *15.

A few cases have addressed such arguments after Muldrow and Plaintiff's argument fails under the persuasive logic of these recent cases. In Revan v. Univ. of Denver Dept of Campus Safety, the court addressed this issue, explaining that:

> [W]hen an employer fails to investigate an employee's complaint based on a discriminatory motive and that failure injures the employee as to the terms or conditions of his employment, the employee has suffered discrimination as defined in Muldrow. Or, said differently, the failure to investigate in such a case has led to "demonstrable harm." [Daniels v. United Parcel Service, Inc, 701 F.3d 620, 640 (10th Cir. 2012).] The D.C. Circuit has persuasively explained that "a claim of discriminatory or retaliatory failure to remediate may be sufficient if the uncorrected action would (if it were discriminatory or retaliatory) be of enough significance to qualify as an adverse action (under the relevant standard)." Baird v. Gotbaum, 662 F.3d 1246, 1249 (D.C. Cir. 2011); cf. Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 348–49 (6th Cir. 2008) (concluding that a reasonable jury could find retaliatory adverse action where male coworker set fire to female plaintiff's car after she reported him for harassment, plaintiff complained about the fire to her employer, and the employer failed to investigate). And the Tenth Circuit has already recognized a comparable rule in the hostile work environment context: "An employer can be held liable if its employees create a hostile work environment and it knew or should have known about the conduct but failed to stop it." Throupe v. Univ. of Denv., 988 F.3d 1243, 1251 (10th Cir. 2021) (quotation omitted).

Revan v. Univ. of Denver Dep't of Campus Safety, No. 25-cv-00528, 2026 WL 376809, at *5 (D. Colo. Feb. 11, 2026). In Revan the court found that the plaintiff plausibly alleged that a purported failure to investigate a complaint constituted an adverse action where the harassment continued and the alleged harasser's conduct rose to the level of a hostile work environment.[16]

Recently, a district court in the Second Circuit found Revan's rationale persuasive, and applying that standard, dismissed the plaintiff's failure to investigate claim because the comments that went unaddressed by the defendant employer were not sufficiently severe or pervasive to constitute a hostile work environment. See Goldstein v. City Univ. of New York, No. 25-cv-

[16] Thus, in Revan, the plaintiff's discrimination claim based on a failure to investigate appears to have been largely duplicative of the plaintiff's hostile work environment claim, which the court also found survived a motion to dismiss

00475, 2026 WL 2532245, at *13 (S.D.N.Y. Aug. 27, 2026) ("If these comments were sufficiently severe and pervasive to create a hostile work environment for Plaintiff, then CUNY and BMCC's failure to adequately investigate and remediate his working conditions could have resulted in an injury actionable under Title VII.").[17] As discussed infra, D'Aiello cannot establish that she was subjected to a hostile work environment. Her related claim that the District subjected her to an adverse action by failing to properly investigate and respond to her complaints is similarly deficient.

In sum, because D'Aiello does not identify any "identifiable term or condition of employment" regarding which she was disadvantaged, and no reasonable jury could find that any of the incidents she cites rise to the level of an adverse employment action under Muldrow, her race discrimination claim necessarily fails.

**D. D'Aiello's ADA Discrimination Claims Fail**

To establish a prima facie case of discrimination under the ADA, a plaintiff must show that: "(1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of his disability or perceived disability." Capobianco v. City of New York, 422 F.3d 47, 56 (2d Cir. 2005).

Discrimination claims under the ADA are subject to the same standard for adverse employment actions as discrimination claims under Title VII. None of the actions D'Aiello identifies meet that standard. D'Aiello contends she suffered an adverse action when she was "mimick[ed], mock[ed], and ridicule[d] for her hearing impairment, not only from Ms. Jackson,

[17] In light of Revan and Goldstein, it appears that the resolution of a plaintiff's "failure to investigate" discrimination claim will very often turn on the viability of the plaintiff's related hostile work environment claim.

but from others as well." (Pl. Opp. at 17.). Jackson's mocking of D'Aiello during the November 19 meeting stopped once D'Aiello asked her to stop and there is no evidence that it ever happened again. At her deposition, D'Aiello also vaguely testified that: "[t]here's been a lot of mocking, like, oh, maybe Ms. D'Aiello didn't hear it. There is jokes made. I'm like the butt end of a joke." (D'Aiello Tr. 342:8–9). D'Aiello, however, does not identify any specific incidents other than Jackson's conduct at the November 19th meeting.[18]

Even assuming arguendo that there is a factual issue as to whether Jackson knew about D'Aiello's hearing impairment and that the Jackon's mocking of D'Aiello at the November 19 meeting was about D'Aiello's hearing impairment—that single, momentary incident does not constitute an actionable adverse action. See, e.g., Blumstein-Torrella v. New York City Dep't of Educ., No. 19-cv-3492, 2024 WL 4973393, at *14 (S.D.N.Y. Sept. 7, 2024), report and recommendation adopted, 2024 WL 4835669 (S.D.N.Y. Nov. 20, 2024) ("Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment.") (citations and quotation marks omitted).

In sum, because D'Aiello has not alleged an adverse action, her disability discrimination claims fail. See, e.g., Garafola v. Dejoy, No. 17-cv-01827, 2022 WL 4642091, at *13 (E.D.N.Y. Sept. 30, 2022) (granting summary judgment where plaintiff did not suffer any adverse action for her disability discrimination claims).

**E. D'Aiello's Retaliation Claims Fail**

Retaliation claims under the ADA and Title VII are governed by the McDonnell Douglas burden-shifting framework. See King v. New York City Dep't of Educ., No. 23-cv-7622, 2025 WL 2083831, at *11 (S.D.N.Y. July 24, 2025). To plead a prima facie case

[18] D'Aiello asserts that Johnson mocked her (and McCormack and Langan) in the audio recordings of his conversations with Kane. (PSOF ¶ 3; see also D'Aiello Aff. at 18.) However, D'Aiello provides no citations or support for that assertion and there is no evidence that anything Johnson said concerned D'Aiello's disability.

of retaliation, the plaintiff must show "(1) she was 'engaged in protected activity' under the law supporting her claim; (2) 'the employer was aware of that activity'; (3) the employee suffered a 'materially adverse action'; and (4) there was 'a causal connection between the protected activity and that adverse action.' Garafola, 2022 WL 4642091, at *12 (quoting Piligian v. Icahn Sch. of Med. at Mount Sinai, 490 F. Supp. 3d 707, 718 (S.D.N.Y. 2020)).

The Court finds that D'Aiello has failed to establish the third element—namely, whether she was subjected to materially adverse action. The adverse action standard for retaliation claims differs from the standard applicable to discrimination claims. To be "materially adverse" in the retaliation context, an employer's actions must "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 25 (2d Cir. 2014) (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)). In the context of retaliation claims, "the Supreme Court in Muldrow explicitly upheld the requirement that such 'retaliatory action' must be 'materially adverse,' meaning that it causes 'significant harm.'" Darwin, 2025 WL 104140, at *6 (citing Muldrow, 601 U.S. at 357); see also Muldrow, 601 U.S. at 357 (reasoning that the test for material adversity in the retaliation context "was meant to capture those (and only those) employer actions serious enough to 'dissuade[] a reasonable worker from making or supporting a charge of discrimination.'" (citing Burlington N. & Santa Fe Ry. Co., 548 U.S. at 68)).

None of D'Aiello's allegations meet that standard.

**1. The District's Alleged Failure to Adequately Investigate, and Respond to, Plaintiff's Complaints**

D'Aiello primarily argues that the District's failure to properly investigate her alleged complaint of discrimination (and to sufficiently discipline Johnson) constituted retaliation for her bringing that same complaint. (See, e.g., Pl. Opp. at 18 ("she suffered from retaliation because Defendants failed to take corrective action and properly respond to her issues and complaints in a

timely fashion[.]"); id. at 29 ("The School's continued failure to take corrective action after she reported verbal threats"). As previously discussed, the undisputed facts do not support D'Aiello's claim that the School failed to properly investigate her initial complaints following the "Karen" comment and the November 19th meeting. The same is true with regard to D'Aiello's Title VII complaint. After D'Aiello filed the complaint in May 2022, District Assistant Superintendent Kane met with D'Aiello, Jackson, and Johnson and other parties present at the November 19th meeting; met with additional witnesses identified by D'Aiello; and issued a detailed report, which noted, among other things, that the complained-of instances were largely limited to the two comments and that subsequent interactions among D'Aiello, Jackson, and Johnson were minimal. District Assistant Superintendent Roberts also issued a counseling memorandum to Johnson regarding concerns about his conduct at the meeting. The evidence in the record therefore does not suggest any failure to investigate or respond to the complaint.

Moreover, even assuming the School failed to conduct a proper investigation following D'Aiello's complaints, such a failure does not, based on the facts here, constitute an actionable adverse act supporting a retaliation claim. See, e.g., Milne v. Navigant Consulting, No. 08-cv-8964, 2010 WL 4456853, at *8 (S.D.N.Y. Oct. 27, 2010) (an employer's "failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint") (citing Fincher v. Depository Trust & Clearing Corp, 604 F.3d 712, 721 (2d Cir. 2010)); see also Vasquez v. Yonkers Pub. Sch. Dist., 2024 WL 1349227, at *7 (S.D.N.Y. Mar. 29, 2024), aff'd, 2025 WL 893368 (2d Cir. Mar. 24, 2025) (concluding that "[d]efendants' alleged failure to investigate [the plaintiff's] various [harassment] complaints . . . do[es] not constitute [a] materially adverse employment action"). Thus, any claim of retaliation relating to the school's alleged inaction or insufficient action fails. Moreover, after the November 19, 2021 meeting, Plaintiff had minimal interactions with Johnson,

and none of those subsequent interactions qualify as materially adverse actions. Cf. Revan, 2026 WL 376809, at *5; Goldstein, 2026 WL 2532245, at *13.

Relatedly, Plaintiff contends that she was "put at risk of injury because Defendants failed to provide basic security and protection from potential issues." (Pl. Opp. at 28.) However, since no relevant facts about this issue are set out in Plaintiff's 56.1 Statement, the Court declines to consider it. Moreover, even the evidence cited in Plaintiff's brief fails to establish that she was subjected to an adverse action. In support, Plaintiff's brief cites to an incident where an irate parent was hiding behind a door in Plaintiff's office and started to "aggressively attack [her] verbally" until a colleague intervened and removed the parent from her office. (D'Aiello Tr. 258.) Although one of Plaintiff's colleagues had originally been called down to the main office to get the parent, the parent ended up in Plaintiff's office. (Id.) While Plaintiff implies that this incident was the fault of an unnamed security guard, there is simply no evidence to support that assertion and the record here does not establish that this incident constitutes an adverse action.

In support of this allegation about "basic security and protection," Plaintiff also points to vague testimony in which she references "correspondences regarding students that I was left out of that influenced [my] ability to do my job," which "happened on numerous occasions." (D'Aiello Tr. 371.) That testimony, however, has nothing to do with "basic security and protection." Moreover, Plaintiff's testimony about this correspondence is so vague and conclusory that it cannot possibly establish that she was subjected to any adverse action in connection with this unspecified correspondence.

D'Aiello also points to various other alleged adverse actions, which are discussed below. None of the acts cited by D'Aiello—whether considered individually or collectively—might have dissuaded a reasonable person from making a discrimination complaint.

**2. The Lockdown Drill Interaction and "Wrong Door" Comment**

Plaintiff asserts that she was subjected to "increased scrutiny" and was improperly targeted for "unnecessary disciplinary actions, particularly leaving early due to anxiety at a particular hearing." (Pl. Opp. at 28.). The deposition testimony Plaintiff cites in support of this argument, however, merely references the lockdown drill incident and the "wrong door" comment and adds nothing additional to Plaintiff's claims. Neither of these incidents qualify as materially adverse actions.

**3. Delayed Repairs to Her Room**

Plaintiff contends that the School's failure "initial failure to correct mold, mildew, fungus, and water damage in her office" qualifies as an adverse action. (Pl. Opp. at 28.)

As D'Aiello admits, the repairs to her office were completed the day after she raised the issues with the Superintendent. It appears that, at most, the repairs took a week and Plaintiff does not even cite specific evidence stating how long this took. The fact that these repairs were not completed sooner is simply not an adverse action. See, e.g., Rector v. United States Dep't of Just., No. 14-cv-1883, 2016 WL 7188135, at *7 (S.D.N.Y. Nov. 22, 2016); Kearse v. ATC Healthcare Servs., No. 12-cv-233, 2014 WL 958738, at *11 (S.D.N.Y. Mar. 11, 2014) ("'[M]inor annoyances' . . . do 'not give rise to actionable retaliation claims.'").

**4. Allegations Concerning Days Off**

D'Aiello contends, in her brief, that the District "initial[ly] refus[e]d to permit her to take already earned and vested days off, requiring [her] to file a grievance almost a year later." (Pl. Opp. at 28.) According to D'Aiello, this conduct was materially adverse. As an initial matter, this alleged incident is not referenced anywhere in Plaintiff's 56.1 Statement. Accordingly, the Court declines to consider this incident.

Moreover, even if this issue had been properly presented, none of the evidence cited by Plaintiff in her brief supports her allegation that the District initially refused to let her take "earned and vested days off."[19] The deposition testimony she cites merely states that she took over 30 days off over the last three years due to the "Karen" comment and its aftermath—some of those were personal days and others were sick days when she could not make it in to work due to the stress of these events. (D'Aiello Tr. 378.) The record also contains a grievance filed by D'Aiello and McCormack, which stated that that they both "used" several sick days due to the incident with Johnson. (Pl. Ex. FF.) According to this grievance, D'Aiello believed that because the incident had not been "corrected," NYS Labor Law Chapter 31, Article 2, Section 27-B required the District to "return[]" these sick days to "their sick banks." (Id.) No deposition testimony or other evidence is cited to explain this grievance or the District's response to this grievance. Notably, the allegations in this grievance do not even support the factual assertion in Plaintiff's brief that that District refused to let her take "earned and vested days off." Rather, this grievance indicates that she was allowed to take sick days off. Moreover, this grievance does not indicate that the District took any materially adverse action against D'Aiello.[20]

**5. Threat Issued by Campbell-Ham**

D'Aiello also alleges that a threat issued by Campbell-Ham qualifies as an adverse action. Langan testified that, at some point in 2021 after the November 19 meeting, Campbell-Ham told Langan that if "I went after Dr. Johnson, she would go after Ms. D'Aiello." (Langan Tr. 200–01.)

---

[19] Relatedly, as part of Plaintiff's hostile work environment claim, she alleges that "Defendants improperly denied Plaintiff to take her paid time off [forcing her to file a grievance]." (Pl. Opp. at 30.) Plaintiff, however, does not cite to any evidence in support of this allegation.

[20] The Court also notes that Plaintiff's affidavit claims that "[o]n September 23, 2024, I was told that Ms. McCormack was not paid for attending the deposition on this case. I was not paid either, as previously discussed." (D'Aiello Aff. ¶ 48.) However, neither Plaintiff's brief nor her 56.1 Statement allege that this is an adverse action. Accordingly, the Court declines to consider it. Moreover, any such claim would fail. See Johnson v. City of New York, No. 23-cv-5378, 2024 WL 3520474, at *7 (S.D.N.Y. July 24, 2024) (holding the alleged denial of paid leave to testify at a Section 50(h) hearing did not constitute a materially adverse employment action).

Plaintiff does not cite any evidence indicating that Langan ever relayed this threat to her. It appears that Plaintiff only learned about this threat during discovery, years after this conversation. (See Pl. Mem at 29 (discussing "threat disclosed from discovery").) Plaintiff does not even identify when, exactly, this threat was "disclosed" during discovery. After this conversation, Langan continued to pursue this issue and Plaintiff herself proceeded to file discrimination complaints and ultimately the instant lawsuit in 2022. Campbell-Ham, however, never took any disciplinary action against Plaintiff.

At best, D'Aiello alleges an isolated threat that was never carried out and was never even communicated to her by Campbell-Ham. D'Aiello only learned about this threat years later during discovery and was never disciplined in the intervening years. Those facts are simply insufficient to constitute a materially adverse action. Courts in the Second Circuit have made clear that an unfulfilled threat, by itself, is not sufficient to constitute a materially adverse action. See, e.g., Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 571 (2d Cir. 2011)) (quoting Vazquez v. Southside United Hous. Dev. Fund Corp., No. 06-cv-5997, 2009 WL 2596490, at *12 (E.D.N.Y. Aug. 21, 2009) ("[E]mpty verbal threats do not cause an injury, and therefore are not material adverse actions, where they are unsupported by any other actions."); Alexander v. City of New York, 957 F. Supp. 2d 239, 249 (E.D.N.Y. 2013) ("threat of discipline do(es) not amount to materially adverse employment actions").

In sum, D'Aiello cannot establish a prima facie case, because the undisputed facts do not show that she was subjected to any action that "would have dissuaded a reasonable worker from bringing or supporting a discrimination charge." Rivera, 743 F.3d at 25.

### F. D'Aiello's Hostile Work Environment Claims Fail

D'Aiello also alleges hostile work environment claims based on her race and disability. Those claims also fail. To prevail on a hostile work environment claim under Title VII or the ADA, a plaintiff must show that her workplace was "permeated with 'discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"[21] Howley v. Town of Stratford, 217 F.3d 141, 153 (2d Cir. 2000) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)); see also Locorriere v. NBTY, Inc., No. 13-cv-7277, 2016 WL 625618, at *11 (E.D.N.Y. Feb. 17, 2016) ("The standard under Title VII is applicable to hostile work environment claims under the ADA."). That standard "has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." See Littlejohn v. City of New York, 795 F.3d 297, 320 (2d Cir. 2015) (citations and quotation marks omitted). "Moreover, to hold an employer liable for such a hostile work environment, federal law requires the plaintiff to show 'a specific basis for imputing the conduct creating the hostile work environment to the employer.'" Maron v. Legal Aid Soc'y, 605 F. Supp. 3d 547, 561 (S.D.N.Y. 2022) (quoting Bentley v. AutoZoners, LLC, 935 F.3d 76, 90 (2d Cir. 2019)).

Factors to consider in determining whether an environment was sufficiently hostile include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003) (citing Harris, 510 U.S. at 23). "As a general rule, incidents must be more than 'episodic; they must be

[21] Plaintiff asserts, in passing, that "Muldrow may have impacted this analysis," (Pl. Opp. at 29), but does not explain how, does not identify what alternative standard should apply, and argues her claim under the traditional "severe or pervasive" standard cited above.

sufficiently continuous and concerted in order to be deemed pervasive.'" Id. (citing Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002)); see also Yan v. Ziba Mode Inc., No. 15-cv-47, 2016 WL 1276456, at *5 (S.D.N.Y. Mar. 29, 2016) ("[A] plaintiff must show 'either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment.'" (quoting Desardouin v. City of Rochester, 708 F.3d 102, 105 (2d Cir. 2013)). "Isolated incidents usually will not suffice to establish a hostile work environment." Redd v. N.Y. State Div. of Parole, 678 F.3d 166, 175–76 (2d Cir. 2012).

Although D'Aiello claims that she subjectively perceived the environment at Freeport to be hostile, she fails to put forth evidence from which a reasonable jury could conclude that the conduct she was subjected to was severe or pervasive. D'Aiello repeats the same factual allegations from her discrimination and retaliation claims in support of her hostile work environment claim. In connection with this hostile work environment claim, the Court has considered all relevant points that were already addressed above in connection with Plaintiff's discrimination and retaliation claims, including, inter alia,: the "Karen" and "fairyland" comments; Jackson's alleged "mocking" of D'Aiello's disability; Johnson's "mob boss" comments concerning Langan, and the School's alleged failure "to take proper disciplinary action against non-Caucasian employees, such as Dr. Johnson and Ms. Jackson."[22] (Pl. Opp. at 30.) She claims that she suffered from "substantial anxiety and stress and, [sic] thus, unable to complete work due to the hostile environment." (Id.)

These incidents do not rise to the level of pervasiveness or severity to state a claim for hostile work environment. Even assuming the "Karen" and "fairyland" comments had to do with

[22] In her brief, Plaintiff claims that she was "punished and rebuked, especially by Ms. Langan, for suffering emotional distress due to the trauma[.]" (Pl. Opp. at 30.) Plaintiff, however, does not cite any evidence in support of this assertion and her 56.1 Statement contains none.

race, they were isolated. D'Aiello does not offer evidence of any further discriminatory comments that were directed at her from Jackson, Johnson, or anyone else.[23] Jackson's mocking, even assuming it had to do with D'Aiello's disability, was also isolated to the November 19th meeting. Moreover, Jackson stopped and apologized, and Plaintiff does not cite to any evidence that D'Aiello had contact (or negative interactions) with her after the November 19th Meeting. D'Aiello also had little contact with Johnson in the aftermath of the meeting (aside from the lockdown drill incident and the "wrong door" comment). That is not the kind of "pervasive conduct" necessary to support a hostile work environment claim. See e.g., Anderson v. State of New York, Off. of Ct. Admin. of Unified Ct. Sys., 614 F. Supp. 2d 404, 425 (S.D.N.Y. 2009), aff'd sub nom. Anderson v. Cahill, 417 F. App'x 92 (2d Cir. 2011) (finding that the employer's alleged racist remarks, which plaintiff heard over the course of several years, did "not constitute pervasive conduct amounting to a hostile work environment."). Rather, these are "isolated instances that are neither sufficiently severe nor pervasive to alter the terms of Plaintiff's employment" and therefore fall "far short of a claim for a hostile work environment." Harris v. Off. of N.Y. State Comptroller, 20-cv-8827, 2022 WL 814289, at *11 (S.D.N.Y. Mar. 17, 2022); see also Wilson v. New York & Presbyterian Hosp., No. 21-cv-1971, 2022 WL 17587564, at *3 (2d Cir. Dec. 13, 2022) ("Treatment that did not constitute adverse action cannot, a fortiori, have 'create[d] an abusive working environment.'").

---

[23] D'Aiello broadly asserts that she was "[f]or years . . . subjected to a hostile work environment by way of derogatory and race and disability-related remarks . . . mocked for her disabilities . . . [and] mocked and insulted in front of her peers." (Pl. Opp. at 30.; see also PSOF ¶ 35 ("There's been a lot of mocking . . . I'm like the butt end of a joke"), citing D'Aiello Tr. 342:6–9.) However, D'Aiello cannot identify any specific instances—other than the two comments and Jackson's mocking—in which discriminatory remarks or jokes were directed at her.

While Johnson repeatedly called Langan a "mob boss," those comments were not directed at Plaintiff. (Notably, Plaintiff's deposition and affidavit do not reference Johnson's "mob boss" comments and there is no evidence in the record that Plaintiff even subjectively viewed those comments as discriminatory). In any event, even assuming that she did, the Court has also considered those comments (along with all the other relevant evidence) in determining whether a jury could conclude that a hostile work environment existed. Even when these "mob boss" comments are considered, Plaintiff's hostile work environment still fails.

D'Aiello alleges, at most, isolated incidents, which are simply "too few, too separate in time, and too mild, under the standard so far delineated by the case law, to create an abusive working environment." Lekettey v. City of New York, No. 14-cv-2528, 2015 WL 1442521, at *6 (S.D.N.Y. Mar. 30, 2015), aff'd, 637 F. App'x 659 (2d Cir. 2016); see, e.g., Shim-Larkin v. City of New York, No. 16-cv-6099, 2023 WL 6519581, at *8 (S.D.N.Y. Aug. 18, 2023) (report and recommendation), adopted by, No. 16-cv-6099, 2023 WL 6236368 (S.D.N.Y. Sept. 26, 2023) (finding that "one explicit comment related to [plaintiff's] status as a victim of domestic violence . . . two incidents involving comments about her race and ethnicity . . . and two comments about her age" were not "are sufficiently related or continuous to support a claim of hostile work environment with respect to any of Plaintiff's protect[ed] characteristics"); Gerzhgorin v. Selfhelp Cmty. Servs., Inc., No. 18-cv-04344, 2022 WL 912523, at *6 (E.D.N.Y. Mar. 29, 2022), aff'd, No. 22-808, 2023 WL 2469824 (2d Cir. Mar. 13, 2023) (finding that plaintiff had failed to demonstrate a "handful of comments" by plaintiff's supervisors, made over the course of three months, were neither sufficiently pervasive nor sufficiently severe to create an "objectively abusive environment"); White v. Roosevelt Union Free Sch. Dist. Bd. of Educ., No. 15-cv-1035, 2025 WL 552744, at *16 (E.D.N.Y. Feb. 19, 2025) (sporadic isolated racial comments made by co-workers were comments were not sufficient to sustain plaintiff's hostile work environment claim).

Additionally, D'Aiello's allegations regarding the School's purported failure to take appropriate corrective action and its alleged treatment of her less favorably than African American employees are speculative. As such, they cannot support her discrimination claims and likewise fail to support her hostile work environment claim.

Moreover, even assuming arguendo that the District failed to properly investigate and respond to her complaints (or that its investigation was tainted by bias), D'Aiello had minimal

interactions with Johnson after she complained (and Plaintiff has not cited any evidence of interactions with Jackson). A reasonable jury could only that the lockdown drill interaction and "wrong door" comment were minor events and, even when those incidents are considered, they are insufficient, along with the other evidence, to establish a hostile work environment.

In short, the conduct of which D'Aiello complains "was not sufficiently severe to alter the conditions of her employment" and therefore cannot support a hostile work environment claim. Anderson, 614 F. Supp. 2d at 425 (S.D.N.Y. 2009).

**G. D'Aiello's Constructive Discharge Claim Fails.**

D'Aiello also alleges, for the first time in her opposition papers, that she suffered an adverse employment action in the form of "constructive termination." (Pl. Opp. at 19 ("[F]ollowing her involuntary resignation (constructive termination), she was forced to take a job where she earns approximately $40,000 less per year, to avoid the emotional impact of the Defendants' discriminatory behavior.")

Constructive discharge is an example of an adverse employment action. See Stidhum v. 161-10 Hillside Auto Ave, LLC, No. 21-cv-07163, 2025 WL 327973, at *9 (E.D.N.Y. Jan. 29, 2025). However, "[w]here an alleged constructive discharge stems from an alleged hostile work environment, a plaintiff 'must show working conditions so intolerable that a reasonable person would have felt compelled to resign.'" Fincher, 604 F.3d at 725 (quoting Pa. State Police v. Suders, 542 U.S. 129, 147 (2004)). "This standard is higher than the standard for establishing a hostile work environment." Id.

As an initial matter, "courts have consistently ruled that it is inappropriate to raise new claims for the first time in submissions at the summary judgment stage." Dealerwing LLC v. Lerner, No. 21-cv-6429, 2024 WL 4252497, at *15 (S.D.N.Y. Sept. 19, 2024) (citations and

quotation marks omitted). Because Plaintiff never amended her complaint to add this constructive discharge claim, the Court declines to consider it.

Moreover, even if this claim had been asserted in the Amended Complaint, it fails on the merits. Because D'Aiello has failed to establish a hostile work environment, she cannot meet the higher standard required to prove constructive discharge. See Fincher, 604 F.3d at 725. D'Aiello's constructive discharge claim is also undermined by the fact that she waited three years after most of the primary events underlying her discrimination complaint to resign, and that Johnson—the primary source of her complaints—resigned before she did. See, e.g., Ternullo v. Reno, 8 F. Supp. 2d 186, 193 (N.D.N.Y. 1998) ("Plaintiff's [constructive discharge] case is significantly undercut by the fact that the source of her problems, [defendant], was removed nearly two months prior to [plaintiff] submitting her resignation"); Woodcock v. Montefiore Med. Ctr. Univ. Hosp., 98-cv-4420, 2002 WL 403601, at *6 (E.D.N.Y. Jan 28, 2002) (finding no constructive discharge where most of the incidents upon which the constructive discharge claim was premised "occurred several months before [plaintiff] eventually resigned").

## III. CONCLUSION

For the foregoing reasons, the Freeport Defendants' motion for summary judgment, (ECF No. 57) is GRANTED as to Plaintiff's federal claims. Plaintiff's federal claims are DISMISSED WITH PREJUDICE. As all of Plaintiff's federal claims have been dismissed, the Court declines to exercise supplemental jurisdiction over all of Plaintiff's state law claims and remands those claims back to Supreme Court, Kings County. The Clerk of Court is directed to close this case.

**SO ORDERED.**

Dated: October 20, 2026
Central Islip, New York

/s/ JMA
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE